# No. 15-3818

---

UNITED STATES COURT OF APPEALS FOR
THE SECOND CIRCUIT

---

SECURITIES AND EXCHANGE COMMISSION,
*Applicant-Appellee*,

v.

THE COMMITTEE ON WAYS AND MEANS OF
THE U.S. HOUSE OF REPRESENTATIVES and BRIAN SUTTER,
*Respondents-Appellants*.

---

On Appeal from the United States District Court for
the Southern District of New York

---

**BRIEF FOR RESPONDENTS-APPELLANTS
THE COMMITTEE ON WAYS AND MEANS OF
THE U.S. HOUSE OF REPRESENTATIVES, AND
BRIAN SUTTER**

Kerry W. Kircher, General Counsel
William Pittard, Deputy General Counsel
Todd B. Tatelman, Senior Assistant Counsel
Eleni M. Roumel, Assistant Counsel
Isaac B. Rosenberg, Assistant Counsel
Kimberly Hamm, Assistant Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700

March 4, 2016

*Counsel for Respondents-Appellants the
Committee on Ways and Means of the U.S.
House of Representatives, and Brian Sutter*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. iii

TABLE OF ACRONYMS AND SHORT CITES ........................................... xiii

JURISDICTIONAL STATEMENT ..................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................. 2

STATEMENT OF THE CASE.......................................................... 3

    I.      The Committee and Its Subcommittee on Health. ................................ 3

    II.     The Committee's Work on Certain Health Issues................................. 5

    III.   The SEC (and DOJ) Investigations and Subpoenas. ............................. 8

SUMMARY OF THE ARGUMENT .................................................. 11

ARGUMENT ....................................................................... 12

    I.      Sovereign Immunity Bars This Action................................................ 12

    II.     The Speech or Debate Clause Bars Enforcement of
         the SEC's Subpoenas.......................................................... 30

        A.    Constitutional Overview. .............................................. 31

        B.    The Immunity Protection Bars These Subpoenas. ........................ 37

        C.    The Non-Disclosure Protection Also Bars These Subpoenas....... 40

    III.   The SEC Brought This Action in the Wrong Court. ........................... 51

CONCLUSION ..................................................................... 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

ADDENDUM:  Reproduction of Particularly Relevant Constitutional
Provisions, Statutes, and Rules:

U.S. Const. art. I, § 6, cl. 1 ................................................................Add.1

U.S. Const. amend. V ........................................................................Add.2

5 U.S.C. § 701(b) ..............................................................................Add.3

5 U.S.C. § 702 ...................................................................................Add.4

15 U.S.C. § 78u(c) ............................................................................Add.5

STOCK Act § 4 .................................................................................Add.6

STOCK Act § 10 ...............................................................................Add.8

House Rule VIII.................................................................................Add.9

House Rule X.1(t) ............................................................................Add.12

House Rule X.2(a), (b).....................................................................Add.14

House Rule XI.1(b)(1) .....................................................................Add.16

Committee Rule 8.3 .........................................................................Add.17

# TABLE OF AUTHORITIES

## **Cases**

*Adeleke v. U.S.*,
   355 F.3d 144 (2d Cir. 2004) .................................................. 22

*Alltel v. DeJordy*,
   675 F.3d 1100 (8th Cir. 2012) .............................................. 15

*Beaulieu v. Vermont*,
   807 F.3d 478 (2d Cir. 2015) ............................................ 29, 30

*Benford v. Am. Broad. Cos.*,
   98 F.R.D. 42 (D. Md. 1983) ................................................. 49

*Benford v. Am. Broad. Cos.*,
   102 F.R.D. 208 (D. Md. 1984) ............................................. 35

*Bonnet v. Harvest*,
   741 F.3d 1155 (10th Cir. 2014) ........................................... 15

*Boron Oil Co. v. Downie*,
   873 F.2d 67 (4th Cir. 1989) ................................................ 15

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) .......................................................... 22

*Brown & Williamson Tobacco Corp. v. Williams*,
   62 F.3d 408 (D.C. Cir. 1995) ............................. 33, 34, 39, 49

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) .......................................................... 56

*Catskill Dev., LLC v. Park Place Entm't Corp.*,
   206 F.R.D. 78 (S.D.N.Y. 2002) ........................................... 30

*Chastain v. Sundquist*,
   833 F.2d 311 (D.C. Cir. 1987) ............................................ 42

*Comm. v. Holder*,
979 F. Supp. 2d 1 (D.D.C. 2013).............................................................. 22

*Comm. v. Miers*,
558 F. Supp. 2d 53 (D.D.C. 2008).......................................................... 22

*COMSAT Corp. v. NSF*,
190 F.3d 269 (4th Cir. 1999) .................................................................. 21

*Costello v. U.S.*,
350 U.S. 359 (1956).................................................................................. 22

*Cruz v. Coach Stores, Inc.*,
196 F.R.D. 228 (S.D.N.Y. 2000)............................................................. 55

*Dep't of Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999)....................................................................... 13, 14, 29

*Dep't of the Army v. FLRA*,
56 F.3d 273 (D.C. Cir. 1995)................................................................. 18

*Defense Supplies Corp. v. U.S. Lines Co.*,
148 F.2d 311 (2d Cir. 1945) ...................................................... 16, 17, 20

*D.H. Blair v. Gottdiener*,
462 F.3d 95 (2d Cir. 2006) ...................................................................... 12

*Doe v. McMillan*,
412 U.S. 306 (1973)........................................................... 32, 34, 36, 42

*Dugan v. Rank*,
372 U.S. 609 (1963)................................................................................. 13

*DMS v. Trammochem*,
451 F.3d 89 (2d Cir. 2006) ...................................................................... 12

*Eades v. Kennedy, PC Law Offices*,
799 F.3d 161 (2d Cir. 2015) ........................................................... 52, 53

iv

*Eastland v. U.S. Servicemen's Fund*,
     421 U.S. 491 (1975)............................................................................ *passim*

*EPA v. Gen. Elec. Co.*,
     197 F.3d 592 (2d Cir. 1999) ........................................................ 15, 21, 25

*FAA v. Cooper*,
     132 S. Ct. 1441 (2012)................................................. 13, 14, 24, 28, 30

*FEC v. Comm. to Elect*,
     613 F.2d 849 (D.C. Cir. 1979)................................................................ 58

*Fed. Mar. Bd. v. Isbrandtsen Co.*,
     356 U.S. 481 (1958)........................................................................ 21, 22

*Galvan v. FPI*,
     199 F.3d 461 (D.C. Cir. 1999)................................................................ 19

*Gov't of Virgin Islands v. Lee*,
     775 F.2d 514 (3d Cir. 1985) .................................................................. 35

*Gravel v. U.S.*,
     408 U.S. 606 (1972)......................................................................... *passim*

*Gray v. Bell*,
     712 F.2d 490 (D.C. Cir. 1983)......................................................... 17, 18

*Helstoski v. Meanor*,
     442 U.S. 500 (1979)................................................................................ 32

*Hubbard v. MSPB*,
     205 F.3d 1315 (Fed. Cir. 2000) ............................................................ 20

*Humid-Aire Corp. v. J. Levitt, Inc.*,
     No. 77-cv-1110, 1977 WL 1529 (N.D. Ill. Nov. 14, 1977).............. 56, 57

*Hutchinson v. Proxmire*,
     443 U.S. 111 (1979)....................................................................... 42, 45

*Ikelionwu v. U.S.*,
    150 F.3d 233 (2d Cir. 1998) .................................................................. 29

*In re Grand Jury Subpoenas*,
    571 F.3d 1200 (D.C. Cir. 2009)............................................................. 33

*In re Guthrie*,
    733 F.2d 634 (4th Cir. 1984) ................................................................ 49

*In re Herald*,
    540 F.App'x 19, 26 (2d Cir. 2013) ........................................................ 59

*In re Hubbard*,
    803 F.3d 1298 (11th Cir. 2015) ............................................................ 50

*In re Nat'l Presto Indus., Inc.*,
    347 F.3d 662 (7th Cir. 2003) ................................................................ 59

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997)............................................................... 22

*In re SEC ex rel. Glotzer*,
    374 F.3d 184 (2d Cir. 2004) ................................................................. 14

*Irwin v. Dep't of Veterans Affairs*,
    498 U.S. 89 (1990)................................................................................. 14

*Kasi v. Angelone*,
    300 F.3d 487 (4th Cir. 2002) ................................................................ 15

*Kawananakoa v. Polybank*,
    205 U.S. 349 (1907)............................................................................... 18

*Lane v. Pena*,
    518 U.S. 187 (1996)........................................................................ 13, 14

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949)........................................................................ 14, 23

vi

*Liberation News Serv. v. Eastland*,
　　426 F.2d 1379 (2d Cir. 1970) ......................................................... 51, 54

*Library of Congress v. Shaw*,
　　478 U.S. 310 (1986)........................................................................ 22, 29

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
　　673 F.3d 50 (2d Cir. 2012) .................................................................... 52

*Lunney v. U.S.*,
　　319 F.3d 550 (2d Cir. 2003) .................................................................. 14

*Maarawi v. U.S. Cong.*,
　　24 F. App'x 43 (2d Cir. 2001) ............................................................... 13

*Makarova v. U.S.*,
　　201 F.3d 110 (2d Cir. 2000) .................................................................. 13

*Mariash v. Morrill*,
　　496 F.2d 1138 (2d Cir. 1974) .......................................................... 52, 57

*McGrain v. Daugherty*,
　　273 U.S. 135 (1927)........................................................................ 22, 39

*McSurely v. McClellan*,
　　553 F.2d 1277 (D.C. Cir. 1976)............................................................. 34

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
　　84 F.3d 560 (2d Cir. 1996) .................................................................... 57

*Miller v. Transamerican*,
　　709 F.2d 524 (9th Cir. 1983) ................................................................ 35

*MINPECO  v. Conticommodity Servs., Inc.*,
　　844 F.2d 856 (D.C. Cir. 1988)............................................... 33, 39, 48, 50

*Mortise v. U.S.*,
　　102 F.3d 693 (2d Cir. 1996) .................................................................. 14

*N.Y. Marine v. Lafarge*,
    599 F.3d 102 (2d Cir. 2010) ................................................... 57

*Orff v. U.S.*,
    545 U.S. 596 (2005)............................................................... 29

*Panama v. BCCI*,
    119 F.3d 935 (11th Cir. 1997) ............................................... 53

*Peay v. BellSouth*,
    205 F.3d 1206 (10th Cir. 2000) ............................................. 53

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984)................................................................. 21

*Robinson v. Overseas Military Sales Corp.*,
    21 F.3d 502 (2d Cir. 1994) .................................................... 13

*Rogers v. Petroleo*,
    673 F.3d 131 (2d Cir. 2012) .................................................. 12

*Rowley v. City*,
    No. 00-CIV-1793 (DAB), 2005 WL 2429514
    (S.D.N.Y. Sept. 30, 2005)...................................................... 33

*Ruhrgas AG v. Marathon Oil*,
    526 U.S. 574 (1999)............................................................... 12

*Senate Select Comm. v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974)............................................... 22

*Southwestern Power Administration v. FERC*,
    763 F.3d 27 (D.C. Cir. 2014)........................................... 19, 20

*Sprecher v. Graber*,
    716 F.2d 968 (2d Cir. 1983) .................................................. 13

*Sinochem Int'l v. Malaysia Int'l*,
    549 U.S. 422 (2007)............................................................... 12

*Tenney v. Brandhove*,
    341 U.S. 367 (1951)......................................................................... 31

*Troma Entm't, Inc. v. Centennial Pictures Inc.*,
    729 F.3d 215 (2d Cir. 2013) ................................................... 51

*United Transp. v. Springfield*,
    Nos. 87-cv-03442P & 88-cv-0117P, 1989 WL 38131
    (D. Me. Mar. 13, 1989).......................................................... 35

*U.S. v. Biaggi*,
    853 F.2d 89 (2d Cir. 1988) ............................................... 34, 37

*U.S. v. Brewster*,
    408 U.S. 501 (1972)................................................ 31, 35, 36, 42

*U.S. v. Constr. Prods. Research, Inc.*,
    73 F.3d 464 (2d Cir. 1996) .........................................................2

*U.S. Dep't of Energy v. Ohio*,
    503 U.S. 607 (1992)........................................... 14, 26, 27, 28

*U.S. v. Dowdy*,
    479 F.2d 213 (4th Cir. 1973) ....................................... 35, 37, 38

*U.S. v. Helstoski*,
    442 U.S. 477 (1979)............................................ 31, 33, 35, 36

*U.S. v. House*,
    556 F. Supp. 150 (D.D.C. 1983)............................................ 22

*U.S. v. Johnson*,
    383 U.S. 169 (1966)....................................... 31, 32, 33, 35, 43

*U.S. v. Mitchell*,
    445 U.S. 535 (1980)............................................................... 13

*U.S. v. Myers*,
    635 F.2d 932 (2d Cir. 1980) ................................................... 32

ix

*U.S. v. Newman*,
    773 F.3d 438 (2d Cir. 2014) ............................................................ 11, 25

*U.S. v. Nordic Village, Inc.*,
    503 U.S. 30 (1992)......................................................................... 14, 29

*U.S. v. Peoples Temple*,
    515 F. Supp. 246 (D.D.C. 1981)............................................................ 39

*U.S. v. Rayburn*,
    497 F.3d 654 (D.C. Cir. 2007).......................................................... 33, 50

*U.S. v. Velazquez*,
    246 F.3d 204 (2d Cir. 2001) .................................................................. 33

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
    241 F.3d 135 (2d Cir. 2001) .................................................................. 53

*Wal-Mart Stores, Inc. v. Visa USA, Inc.*,
    395 F.App'x 743 (2d Cir. 2010) ....................................................... 58, 60

*Watkins v. U.S.*,
    354 U.S. 178 (1957)............................................................................. 22

*Webster v. Sun*,
    561 F. Supp. 1184 (D.D.C. 1983)......................................................... 35

*Willingway v. Blue Cross*,
    870 F. Supp. 1102 (S.D. Ga. 1994) ...................................................... 53

*X-Men v. Pataki*,
    196 F.3d 56 (2d Cir. 1999) ................................................................... 35

## Constitutional Provisions

U.S. Const. art. I...................................................................................... 45

U.S. Const. art. I, § 1 .............................................................................. 22

U.S. Const. art. I, § 6, cl. 1 ............................................................. 1, 2

U.S. Const. art. II ............................................................................. 45

U.S. Const. amend. V ................................................................. 22, 52

**Statutes**

5 U.S.C. § 701(b)(1)(A) ............................................................. 20, 25

5 U.S.C. § 702 ............................................................................ 20, 25

15 U.S.C. § 78aa(a) ................................................................... 52, 53

15 U.S.C. § 78u(c) ................................................................. 1, 51, 52

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. § 1404(a) ........................................................... 56, 57, 60

31 U.S.C. § 3730(b)(4)(A) ............................................................. 19

31 U.S.C. § 3730(c) ....................................................................... 19

33 U.S.C. § 1323(a) ....................................................................... 27

33 U.S.C. § 1365(a) ....................................................................... 27

42 U.S.C. § 6961 ........................................................................... 28

Medicare Access and CHIP Reauthorization Act of 2015,
    Pub. L. No. 114-10, 129 Stat. 87 (2015) .....................................7

STOCK Act, Pub. L. No. 112-105, 126 Stat. 291 (2012)...................... 24, 25, 26

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072 (1991)........... 23

**Legislative Authorities**

Rules of the House of Representatives, 114th Cong. (2015)............... 3, 4, 23, 24

Rules of the House of Representatives, 113th Cong. (2013)................................4

Manual of Rules of the Comm...., 114th Cong. (2015) ........................................4

Manual of Rules of the Comm...., 113th Cong. (2013) ........................................5

17 Cong. Rec. 1295 (1886) ............................................................................... 24

## **Other Authorities**

CONSTITUTION, JEFFERSON'S MANUAL, AND RULES OF THE HOUSE OF
REPRESENTATIVES, H. R. Doc. No. 113-181 (2015).......................................... 24

1 Wm. Blackstone, Commentaries.................................................................... 17

15B Fed. Prac. & Proc. Juris. § 1068.1 (2d ed.) ......................................... 52, 57

15B Fed. Prac. & Proc. Juris. § 3914.26 (2d ed.) .................................................2

Brody Mullins, et al., *Probe…Hits Wall*, Wall St. J., Nov. 21, 2013................ 11

## TABLE OF ACRONYMS AND SHORT CITES

APA                         Administrative Procedure Act

CMS                         Centers for Medicare &
                            Medicaid Services

Committee                   Committee on Ways and Means,
                            U.S. House of Representatives

Committee Subpoena          SEC Administrative Subpoena
                            to Committee

CWA                         Clean Water Act

DDC                         U.S. District Court for
                            the District of Columbia

DHHS                        U.S. Department of
                            Health and Human Services

District Court Decision     Memorandum Opinion & Order
                            (Nov. 13, 2015) (D.Ct. ECF #35)

DOJ                         U.S. Department of Justice

EPA                         U.S. Environmental Protection Agency

Exchange Act                Securities Exchange Act of 1934

FERC                        Federal Energy Regulatory Commission

FLRA                        Federal Labor Relations Authority

FLSA                        Fair Labor Standards Act

FPI                         Federal Prison Industries, Inc.

Greenberg                   Greenberg Traurig, LLP

| | |
|---|---|
| House District Court Opening Memorandum | Resp'ts' Consolidated [Mem.] (July 4, 2014) (D.Ct. ECF #15) |
| House Rules | Rules of the House of Representatives, 114th Cong. (2015) |
| JA | Joint Appendix |
| MA | Medicare Advantage |
| MSPB | Merit Systems Protection Board |
| SDNY | U.S. District Court for the Southern District of New York |
| SEC | U.S. Securities and Exchange Commission |
| SEC District Court Opening Memorandum | [SEC] Mem…. (June 20, 2014) (D.Ct. ECF #2) |
| SEC District Court Reply | [SEC] Reply… (July 16, 2014) (D.Ct. ECF #21) |
| SGR | Sustainable Growth Rate Formula |
| Sutter Subpoena | SEC Administrative Subpoena to Brian Sutter |

## JURISDICTIONAL STATEMENT

Respondents-Appellants the Committee on Ways and Means of the U.S. House of Representatives ("Committee") and Brian Sutter, former Staff Director for the Committee's Subcommittee on Health,[1] contest jurisdiction.  They do so on grounds of both subject matter jurisdiction (sovereign immunity and the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1) and personal jurisdiction.  (The Committee and Sutter also contest the District Court's denial of their request for a transfer of venue).

Applicant-Appellee the Securities and Exchange Commission ("SEC") – which seeks to enforce administrative subpoenas issued to the Committee and Sutter – invoked the District Court's jurisdiction pursuant to 15 U.S.C. § 78u(c) (providing statutory subject matter jurisdiction, and venue, for SEC subpoena enforcement actions).  *See* [SEC]'s Appl. for an Order...¶10 (June 20, 2014) (D.Ct. ECF #1; JA9-13).  The District Court relied on the same basis for jurisdiction, and venue.  *See* Mem. Op. & Order at 1, 9, 28 (Nov. 13, 2015) (D.Ct. ECF #35; JA102-77) ("District Court Decision"), *reported at* 2015 U.S. Dist. LEXIS 154302.

The District Court issued its final order – limiting, but otherwise enforcing, the SEC's subpoenas – on November 13, 2015.  *See* JA165-71,177.  The

---

[1]  In December 2014, while this action was pending, Sutter voluntarily resigned his Subcommittee position, and accepted a new position in the private sector.

Committee and Sutter timely noticed their appeal, and the District Court stayed its judgment pending appeal. *See* Notice of Appeal (Nov. 25, 2015) (D.Ct. ECF #40; JA178-80); Order (Dec. 7, 2015) (D.Ct. ECF #47; JA181-90). The SEC did not cross-appeal.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, among other grounds. *See, e.g.*, *U.S. v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 468-69 (2d Cir. 1996); 15B Fed. Prac. & Proc. Juris. § 3914.26 & n.7 (2d ed.) ("Wright & Miller"); JA187n.3.

## ISSUES PRESENTED FOR REVIEW

The Committee and Sutter present three issues on appeal, all raised below:

1. Whether the SEC's action is barred by the sovereign immunity doctrine.

2. Whether the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1 ("[F]or any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place."), bars enforcement of the SEC's subpoenas.

3. Whether the SEC brought this action in the proper court (i.e., whether the District Court lacked personal jurisdiction over the Committee and Sutter and/or erred in denying transfer of venue).

## STATEMENT OF THE CASE

The SEC sued to enforce administrative subpoenas, issued to the Committee and Sutter, respectively. The District Court – Hon. Paul G. Gardephe – held that the subpoenas (i) were "overbroad" in that they demanded documents and information "beyond the subject matter of [the agency's] investigation," and (ii) demanded documents and information privileged under the Speech or Debate Clause. JA165-71,177. Otherwise, however, the District Court enforced the subpoenas, ordering the production of documents (and a "log" of withheld documents) and the provision of deposition testimony. *Id.*

The District Court so held, notwithstanding that the SEC was asking the federal judiciary (in New York) to compel the Committee and Sutter to produce documents (in Washington, D.C.) and provide deposition testimony (in Washington, D.C.) regarding the Committee's investigation (in Washington, D.C.) into particular policy matters within the Committee's legislative jurisdiction.

## I.    The Committee and Its Subcommittee on Health.

The Committee is a standing committee of the House. *See* Rule X.1(t), Rules of the House of Representatives, 114th Cong. (2015) ("House Rules"), http://clerk.house.gov/legislative/house-rules.pdf. Its jurisdiction over "revenue measures generally" makes it essential to the operation of the House and the country, an importance that is magnified as to health care policy issues by its

3

additional jurisdiction over those "health care...programs" supported by "payroll deductions," including Medicare. *Id.*

Regarding those subject matters, the House has vested the Committee with various legislative responsibilities, including "determin[ing] whether laws and programs…are being implemented and carried out in accordance with the intent of Congress" and "whether they should be continued, curtailed, or eliminated." House Rule X.2(a), (b)(1); *see also, e.g.*, House Rule XI.1(b)(1) ("Each committee may conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities under rule X.").

The Committee, in turn, has delegated to its Subcommittee on Health initial jurisdiction over those Committee matters "that relate to programs providing payments (from any source) for health care, health delivery systems, or health research," including particularly those "bills and matters that relate to the health care programs of the Social Security Act (including title[]...XVIII [Medicare]...)." Rule 8.3, Manual of Rules of the Comm...., 114th Cong. (2015), http://waysandmeans.house.gov/wp-content/uploads/2015/11/11th-WM-Rules-Adopted-118115-.pdf.[2]

---

[2] The cited House and Committee rules of the 114th Congress (Jan.2015–Jan.2017) do not differ materially from those of the 113th (Jan.2013–Jan.2015), i.e., those in effect during the events in question here. *See* Rules of the House of Representatives, 113th Cong. (2013), https://www.gpo.gov/fdsys/pkg/HMAN-

(*Continued...*)

**II.    The Committee's Work on Certain Health Issues.**

At the beginning of the relevant Congress (the 113th), the Committee

adopted an Oversight Plan that, consistent with its above-described responsibilities,

articulated its intention to investigate the calculation by the Department of Health

and Human Services ("DHHS") – and its sub-entity, the Centers for Medicare and

Medicaid Services ("CMS") – of certain Medicare physician reimbursements.  *See*

JA196 (particularly referencing reimbursements in connection with the Medicare

Advantage ("MA") program).

Pursuant to its authority and consistent with that Oversight Plan, the

Committee, on February 7, 2013, released its framework for reform of Medicare's

Sustainable Growth Rate Formula ("SGR"), a formula critical to DHHS's (and

CMS's) calculation of MA physician reimbursement rates.  JA191-93.  The

framework called for, among other things, "[f]ully repealing the SGR" and

enacting, in its place, "statutorily-defined payment rates."  JA191,192 (also

proposing various DHHS reporting requirements to "[p]rovide [Congress]

information for further improvements"); *see also* JA191 (noting that Committee

generated these proposed reforms after "series of Health Subcommittee

hearings...on reforming the Medicare physician payment system," "[s]taff meetings

---

113/pdf/HMAN-113-houserules.pdf; Manual of Rules of the Comm...., 113th
Cong. (2013), http://waysandmeans.house.gov/UploadedFiles/Rules113th.pdf.

with physicians, physician organizations and other stakeholders," and "[r]esponses from over 70 physician organizations to a...letter asking for guidance on incorporating quality and efficiency into the Medicare payment system").

On February 28, 2013, the Committee wrote to Marilyn Tavenner, the then-Acting Administrator of CMS, seeking information regarding CMS's "February 15...announcements [regarding the SGR and] affecting [MA] payments and policies." JA201-03 (asking questions, and requesting "a written response to our questions by March 15, 2013"). The Committee focused on, among other issues, CMS's assumption "that Congress will not patch [via legislation] the...physician payment cut scheduled for 2014," and the effect of that assumption on the SGR and the MA program generally. JA202.

On March 15, 2013, the Subcommittee on Health held a hearing regarding issues raised by the annual report of the Medicare Payment Advisory Commission, a "congressional support agency that provides...advice to the Congress on issues affecting the Medicare program." JA204,209. That hearing again focused particularly on the SGR and the MA program generally. JA204,209,216-20.

On April 3, 2013, the Committee issued a memorandum summarizing "stakeholder input" – and soliciting additional "feedback" – regarding the Committee's proposed legislation regarding the "SGR physician payment system." JA222-28.

Beyond April 2013 and throughout the 113th Congress, the Committee continued to pursue its legislative agenda with regard to these issues. For example, (i) on May 7, 2013, the Subcommittee on Health conducted a hearing devoted to SGR reform, *see* JA229-31; (ii) on June 20, 2013, the Subcommittee conducted a Medicare hearing that included consideration of the SGR and the status of the MA program, *see* JA232-34; (iii) on October 31, 2013, the Committee released a discussion draft of the Committee's proposed SGR legislation, *see* JA235-38; (iv) on December 12, 2013, the Committee conducted a markup regarding its SGR reform bill, *see* JA239-40; (v) on February 6, 2014, the Committee chairman introduced replacement SGR reform legislation, *see* JA241-43; and (vi) on March 14, 2014, the House passed that legislation, *see* JA244-47.

Finally, in the 114th Congress, the House and Senate passed, and the President signed, the Medicare Access and CHIP Reauthorization Act of 2015, Pub. L. No. 114-10, § 101, 129 Stat. 87, 89 (2015), which repealed the SGR and adopted a new approach to determining Medicare payments to physicians, including those participating in the MA program.

Clearly and indisputably, therefore, the Committee and its Subcommittee on Health – with Sutter as its Staff Director – had a deep and abiding legislative interest in DHHS, CMS in particular, the MA program, and the SGR. It is

precisely this legislative interest and activity that the District Court Decision would allow the SEC to probe, as further explained below.

## III. The SEC (and DOJ) Investigations and Subpoenas.

In or about April 2013, the SEC began investigating certain April 1, 2013 trading in the stock of Humana Inc. and, in particular, whether that trading was improperly influenced by a leak from CMS regarding its announcement, later that day, regarding the SGR and certain MA reimbursement rates. *See, e.g.*, JA16-17,¶¶9-14. The SEC has alleged that "a lobbyist at Greenberg" correctly predicted certain aspects of the rate announcement, that he shared his prediction with "an analyst at Height Securities, LLC," and that that analyst, or colleagues of his, in turn further shared the prediction with certain of Height's clients, after all of which the "trading volume and prices of stocks of certain health insurers rose precipitously." JA17,¶¶12-14; *see also, e.g.*, JA98-99,¶¶5,7 (agency investigation "is substantially concerned with the investor clients of Height Securities," comprising "forty-four (44) investment funds and other entities," which clients allegedly "received the subject Height email" and thereafter "may have engaged in relevant trading on April 1[, 2013]" that affected four health insurance companies).

Because Sutter, for the Committee, also was following the expected CMS rate announcement during the relevant time period (given its importance to the Committee's work with respect to the SGR, the MA program, CMS, and DHHS

generally), and thus would have spoken with CMS officials and the relevant health care lobbyist during that time frame, the SEC in January 2014 contacted the Committee and Sutter. *See* JA18-19,¶¶17-20,26. On May 6, 2014, the SEC issued two administrative subpoenas, one to the Committee for documents and one to Sutter for documents and testimony. *See* JA28-31,32-35.

The Committee Subpoena demanded the following documents, for the time period "February 10, 2013 through and including April 10, 2013":

> 1. All documents concerning communications between Sutter and any member or employee of Greenberg...;
>
> 2. All documents concerning communications between Sutter and CMS;
>
> 3. All documents concerning communications to, from, copying, or blind-copying Sutter concerning (i) the preliminary 2014 [MA] payment rates announced by CMS on February 15, 2013, and/or (ii) the final 2014 [MA] payment rates announced by CMS on April 1, 2013...;
>
> 4. All documents concerning communications to, from, copying, or blind-copying Sutter concerning the potential confirmation of [Tavenner] as CMS Administrator by the U.S. Senate;
>
> 5. All documents created by Sutter or in Sutter's files, including without limitation handwritten notes and calendar entries, concerning (i) [certain Greenberg individuals]; (ii) the [MA] Rates; and/or (iii) the potential confirmation of [Tavenner] as CMS Administrator by the U.S. Senate; and
>
> 6. All telephone records...from Sutter's work phones.

9

JA30-31.  For purposes of this appeal, the Sutter Subpoena sought the same categories of records.  *See* JA34-35; House D.Ct. Opening Mem. at 10 & n.10 (explaining that Sutter voluntarily provided SEC with single type of record unique to his subpoena).  With respect to the SEC's testimonial demands, the agency stated that it intended to interrogate Sutter about the same topic areas:  (i) "his communications with [Greenberg], during the relevant time period, which is roughly February through mid-April 2013," and (ii) his "knowledge of the contents of the Rate Announcement, including...any communications he had on this subject with CMS."  JA48.

Despite having little to offer – Sutter never held any material, nonpublic information regarding CMS's rate announcements, *see* House D.Ct. Opening Mem. at 1, 42-44; SEC D.Ct. Reply at 3 ("The Commission has alleged no wrongdoing....") – Sutter voluntarily provided a May 28, 2014 attorney proffer. *See* JA21,¶33.  He provided that attorney proffer not only to the SEC but also to the Department of Justice ("DOJ"), which had been simultaneously investigating the same matter. *See* JA76,82.  Shortly thereafter, DOJ withdrew its own then-pending subpoena for Sutter's testimony, in apparent recognition of the fact that Sutter does not possess relevant information, much less information that may be compelled.

10

The SEC, on the other hand, responded on June 20, 2014, by initiating this litigation to enforce its administrative subpoenas. *See* JA9-13. It did so notwithstanding both that it was investigating the same circumstances into which DOJ was inquiring and that its investigation, according to press reports, already had run its course, *see, e.g.*, Brody Mullins, et al., *Probe…Hits Wall*, Wall St. J., Nov. 21, 2013, http://www.wsj.com/articles/ SB10001424052702304607104579210320473074320.[3]

After briefing, the District Court held that the SEC's subpoenas (i) were "overbroad," and (ii) demanded privileged documents and information. JA165-71, 177. The District Court also concluded, however, that other aspects of the subpoenas were enforceable. *See id.*

## SUMMARY OF THE ARGUMENT

Having embarked on a remarkable fishing expedition for core *legislative* records, and having met resistance, the SEC invited the federal judiciary to enforce the agency's administrative subpoenas. The District Court, in significant part, countenanced that intrusion.

---

[3] In any event, this Circuit's subsequent decision in *U.S. v. Newman*, 773 F.3d 438, 450, 455 (2d Cir. 2014) (limiting theories of insider trading), *cert. denied*, 136 S. Ct. 242 (2015), fully interred the agency's investigation. *See also infra* Argument, Part II.A.3. Notwithstanding, the agency has insisted on prosecuting this subpoena enforcement action.

This Court should reverse the District Court Decision, and direct the dismissal, or transfer, of the SEC's enforcement action, for one or more of the following reasons. *First*, this action is barred by the doctrine of sovereign immunity. *Second*, the Committee and Sutter are "absolute[ly]" immune under the Speech or Debate Clause because the SEC seeks to compel production of information concerning Committee activity "within the sphere of legitimate legislative activity," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501, 503, 509-10 & n.16 (1975). And, *third*, the SEC brought this action in the wrong court: The District Court lacked personal jurisdiction over the Committee and Sutter, and venue was much more appropriate in the U.S. District Court for the District of Columbia.[4]

## ARGUMENT

**I.    Sovereign Immunity Bars This Action.**

"It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court

---

[4] Because each of these arguments addresses a threshold issue, rather than the merits, this Court may select among them as it sees fit. *See, e.g.*, *Sinochem Int'l v. Malaysia Int'l*, 549 U.S. 422, 425, 429-31 (2007); *Ruhrgas AG v. Marathon Oil*, 526 U.S. 574, 588 (1999). Each issue involves de novo review, except for transfer of venue, for which the abuse of discretion standard applies. *See Rogers v. Petroleo*, 673 F.3d 131, 136 (2d Cir. 2012) (subject matter jurisdiction; i.e., sovereign immunity and Speech or Debate); *DMS v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (personal jurisdiction); *D.H. Blair v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) (transfer of venue).

define that court's jurisdiction to entertain the suit." *U.S. v. Mitchell*, 445 U.S. 535, 538 (1980) (quotation marks, brackets, and ellipsis omitted). Because "[t]he doctrine of sovereign immunity is jurisdictional in nature," the SEC "bears the burden of establishing that [its] claims fall within an applicable [immunity] waiver." *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000).

Sovereign immunity protects not only the United States itself, but also its component entities and the officials acting on those entities' behalf. *See, e.g.*, *Dugan v. Rank*, 372 U.S. 609, 620 (1963) ("[A] suit is against the sovereign...if the effect of the judgment would be...to compel [the Government] to act." (quotation marks omitted)).[5] The protections of the doctrine are absolute, absent a waiver that "must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted).[6] Any such waiver itself

---

[5] *See also, e.g.*, *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." (quotation marks omitted)); *Maarawi v. U.S. Congress*, 24 F.App'x 43, 44 (2d Cir. 2001) (no jurisdiction over claims against Congress because, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit" (quotation marks omitted)); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived."); *accord Sprecher v. Graber*, 716 F.2d 968, 975 (2d Cir. 1983).

[6] *Accord FAA v. Cooper*, 132 S. Ct. 1441, 1448 (2012) ("We have said on many occasions that a waiver of sovereign immunity must be unequivocally expressed in statutory text." (quotation marks omitted)); *Lane*, 518 U.S. at 192 ("A statute's
(*Continued*...)

13

must be "strictly construed, in terms of its scope, in favor of the sovereign," *Blue Fox*, 525 U.S. at 261, such that any "plausible" reading of the waiver that would limit its scope is sufficient to retain immunity, *Cooper*, 132 S. Ct. at 1448, 1453.[7]

Accordingly, the doctrine applies, and any waivers are construed narrowly, regardless of any perceived resultant inefficiencies or injustices.[8]

Finally, sovereign immunity applies particularly in the context of subpoena enforcement actions. *See, e.g.*, *In re SEC ex rel. Glotzer*, 374 F.3d 184, 190, 192

---

legislative history cannot supply a waiver that does not appear clearly in any statutory text...."; "[W]e insist upon...an expression in statutory text."); *see also, e.g.*, *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) ("A waiver of sovereign immunity cannot be implied but must be unequivocally expressed." (quotation marks omitted)).

[7] *Accord Cooper*, 132 S. Ct. at 1448 ("Any ambiguities in the statutory language are to be construed in favor of immunity…."; "[W]e...construe any ambiguities in the scope of a waiver in favor of the sovereign."; holding that "plausible" limiting reading sufficient to defeat extension of waiver); *Lane*, 518 U.S. at 192 ("[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."); *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (same); *U.S. v. Nordic Village, Inc.*, 503 U.S. 30, 33-34, 37 (1992) ("The foregoing are assuredly not the only readings of [the relevant statute], but they are plausible ones—which is enough to establish that [proposed waiver] is not 'unambiguous' and therefore should not be adopted."); *Lunney v. U.S.*, 319 F.3d 550, 554 (2d Cir. 2003) ("Sovereign immunity is a jurisdictional bar, and a waiver of sovereign immunity is to be construed strictly and limited to its express terms.").

[8] *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 700-01 (1949) ("Wrongful the Secretary's conduct might be, but a suit to relieve the wrong...would interfere with the sovereign...and hence must fail."); *Mortise v. U.S.*, 102 F.3d 693, 695-96, 697 (2d Cir. 1996) ("Although the conduct of the National Guard was[]...outrageous, the law requires us to affirm the district court's grant of the government's [sovereign immunity] motion....").

14

(2d Cir. 2004) (agreeing with SEC that sovereign immunity barred enforcement of subpoena to SEC, absent express waiver); *EPA v. Gen. Elec. Co.*, 197 F.3d 592, 597 (2d Cir. 1999) ("[E]nforcement of this [federal judicial] subpoena duces tecum issued by General Electric to [an EPA official] would compel the EPA to act and therefore is barred by sovereign immunity in the absence of a waiver."), *vacated in irrelevant part, on other grounds*, 212 F.3d 689 (2d Cir. 2000).[9]

All of the above is black letter law, generally acknowledged by the District Court and not disputed by the SEC. *See, e.g.*, JA113-16; SEC D.Ct. Opening Mem. at 23; SEC D.Ct. Reply at 3-6.

Notwithstanding that law, however, the District Court: (a) discovered a previously-unknown exception to the sovereign immunity doctrine for actions brought by one component of the federal government against another, and (b) concluded that, even if no such exception exists, Congress has waived its immunity. *See* JA116-19,119-22. In fact, no such exception or waiver exists.

---

[9] *Accord Kasi v. Angelone*, 300 F.3d 487, 502-04 (4th Cir. 2002) (sovereign immunity barred enforcement of death penalty defendant's subpoena to third-party federal agency); *Boron Oil Co. v. Downie*, 873 F.2d 67, 71 (4th Cir. 1989) ("subpoena proceedings fall within the protection of sovereign immunity"); *cf. Bonnet v. Harvest*, 741 F.3d 1155, 1159-62 (10th Cir. 2014) (sovereign immunity enjoyed by Native American tribe – which immunity subject to congressionally-imposed waiver – allows tribe, in absence of such waiver, to decline compliance with federal court subpoena); *Alltel v. DeJordy*, 675 F.3d 1100, 1106 (8th Cir. 2012) (same for subpoena to tribal official).

A.    Intra-Governmental Exception.  Neither the SEC nor the District Court cited any authority establishing any intra-governmental exception to the sovereign immunity doctrine, and settled law forecloses the creation of any such exception.

1.    Indeed, this Court already has so held.  In *Defense Supplies Corp. v. U.S. Lines Co.*, 148 F.2d 311, 311-312 (2d Cir. 1945), the United States asserted sovereign immunity against the claims of a wholly owned instrumentality of the federal government, the Defense Supplies Corporation.  While this Court recognized at the outset that "the complete ownership of the Defense Supplies Corporation by the United States shows this to be nothing more than an action by the United States against the United States," 148 F.2d at 312 & n.3, it applied the sovereign immunity doctrine:

> [Where the relevant claim involves] a suit...against the United States, we must follow the rule of strict construction....[T]he United States cannot be sued without [its] consent, and, if Congress in certain cases gives its consent, the courts are confined to the letter of the statute which expresses such consent.

*Id.* at 312; *see also supra* nn.5-8 & accompanying text.  This Court then concluded that the relevant statute provided no such express waiver, and thus that "the Defense Supplies Corporation cannot maintain a suit against the United States." *Id.* at 313; *see also id.* at 313 n.5 (noting that, in light of absence of statutory waiver, court need not reach further justiciability concern).

16

The District Court avoided the *Defense Supplies* holding by declaring, in a footnote, that the decision "does not address sovereign immunity" and thus "does not shed light on the [present] question."  JA119n.9.  But that is plainly wrong: *Defense Supplies* in fact squarely addresses sovereign immunity (as recited above), and does so in the context of an action "by the United States against the United States."  148 F.2d at 312 & n.3.

   2. *Defense Supplies* confirms our historical understanding that sovereign immunity *does protect* one component of the federal government against another (except where, by Constitution or statute, that immunity has been expressly altered, as discussed below).  Blackstone, for example, emphasized that sovereign immunity rests on the concept that "all jurisdiction implies superiority of power" and that, in the absence of such superiority, the doctrine bars jurisdiction.  1 Wm. Blackstone, Commentaries *242-45; *see also id.* at *244 (noting that sovereign immunity protects legislature against executive:  "[I]f the king had a right to animadvert [pass censure] on either of the houses [of parliament], that branch of the legislature, so subject to animadversion, would instantly cease to be part of the supreme power....");  *Gray v. Bell*, 712 F.2d 490, 511 (D.C. Cir. 1983) (identifying "traditional principles of separation of powers" as "most important" policy basis underlying sovereign immunity).  Under our tripartite form of government, no branch is superior to the other, much less is the SEC – a statutory creation of

Congress – superior to Congress; accordingly sovereign immunity applies. *See also, e.g.*, *Kawananakoa v. Polybank*, 205 U.S. 349, 353 (1907) (Holmes, J.) ("A sovereign is exempt from suit…on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.").

        3.     *Defense Supplies* is in line not only with the purposes underlying the sovereign immunity doctrine but also the authority in other circuits. In *Department of the Army v. FLRA*, 56 F.3d 273 (D.C. Cir. 1995), the D.C. Circuit expressly considered, and rejected, the notion that there exists an intra-governmental exception to the sovereign immunity doctrine. There, the Army asserted sovereign immunity against the FLRA, which agency had ordered the Army to take certain actions. *See* 56 F.3d at 274-75. The FLRA noted that "the United States is on both sides of this case" and then made the SEC's argument: "[T]here is no sovereign immunity in the government-against-government situation" because that doctrine is not designed "to protect one Government agency from litigation initiated by another." *Id.* at 275. The D.C. Circuit unanimously rejected that argument, concluding instead that the FLRA's contention constituted "an unduly circumscribed notion of the doctrine of sovereign immunity." *Id.*; *see also id.* at 275-76 (citing *Gray*, 712 F.2d at 511, for "policy bases of sovereign immunity"); *Gray*, 712 F.2d at 511 (identifying "[f]irst" and "most important" such

18

basis as "traditional principles of separation of powers"; also noting concern not to "inhibit vigorous decisionmaking by government policymakers").

Subsequently, the D.C. Circuit twice has reaffirmed its *Department of the Army* holding.

In *Galvan v. FPI*, 199 F.3d 461, 462 (D.C. Cir. 1999), the D.C. Circuit considered an assertion of sovereign immunity in a qui tam action in which the United States had intervened as the controlling plaintiff, per 31 U.S.C. § 3730(b)(4)(A), (c). The defendant was FPI, "a wholly owned government corporation," and thus the case "pitted the United States executive branch against itself." 199 F.3d at 462 (quotation marks omitted). Notwithstanding this circumstance, the D.C. Circuit unanimously concluded: "We agree with the government's sovereign immunity defense and affirm the dismissal on that ground...." *Id.* at 462, 464-68 (emphasizing robust nature of doctrine).

And, in *Southwestern Power Administration v. FERC*, 763 F.3d 27 (D.C. Cir. 2014), the D.C. Circuit, again unanimously, re-affirmed that there exists no intra-governmental exception to the sovereign immunity doctrine. There, the D.C. Circuit considered an effort by FERC to impose penalties on the Departments of Interior and Energy, and "a subdivision of the Department of Energy [the Southwestern Power Administration]." 763 F.3d at 30. The D.C. Circuit concluded that the sovereign immunity doctrine applied "in the context of a dispute

19

like this one pitting an independent agency against another federal government entity." *Id.* at 31; *see also id.* at 31-36 (again emphasizing robust nature of doctrine).

The Federal Circuit has reached the same conclusion.  In *Hubbard v. MSPB*, 205 F.3d 1315 (Fed. Cir. 2000), that Circuit considered an action in which the MSPB had determined that sovereign immunity barred it from imposing certain sanctions on the EPA.  The Federal Circuit affirmed, on the same basis.  *See* 205 F.3d at 1317-18 (agreeing with MSPB that statutory waiver of sovereign immunity permitting MSPB to "order corrective action" in disputes between federal agencies and their employees not sufficiently unambiguous to permit MSPB to impose award of back pay).

4.     Indeed, the discovery of an intra-governmental exception to the doctrine of sovereign immunity not only is foreclosed by this Court's decision in *Defense Supplies*, the historical understanding of the doctrine, and the settled application of the doctrine across the federal courts, it would contravene the Supreme Court's, and this Court's, repeated exhortations that courts may not fashion exceptions to the doctrine.  *See, e.g.*, *supra* nn.5-8 & accompanying text. Rather, it is for Congress to create such exceptions (and for the courts to interpret those exceptions narrowly, *see id.*; *see also infra* Argument, Part I.B), as Congress in fact has done through the APA.  *See* 5 U.S.C. §§ 701(b)(1)(A), 702 (waiving

sovereign immunity as to certain actions, including subpoena enforcement actions, against certain governmental entities, not including Congress); *EPA*, 197 F.3d at 598 ("[T]he only identifiable waiver of sovereign immunity that would permit a court to require a response [from a government entity] to a subpoena in an action in which the government is not a party [i.e., is the recipient of a third-party subpoena] is found in the APA [i.e., 5 U.S.C. § 702].").[10]

       5.    In contrast to this settled law, the District Court pointed to no law – and we are not aware of any – establishing any intra-governmental exception to the sovereign immunity doctrine.  Rather, the District Court rested solely on the *absence* of a discussion of the sovereign immunity doctrine in a handful of previous intra-governmental disputes.  That was error.

    First, "when questions of jurisdiction have been passed on in prior decisions *sub silentio*," courts are not bound when a party in "a subsequent case finally [raises] the jurisdictional issue." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119 (1984) (quotation marks and brackets omitted); *see also, e.g.*, *Fed.*

---

[10]  *See also, e.g.*, *supra* n.9 & accompanying text; *EPA*, 197 F.3d at 597-99 ("The only express waiver to be found in this regard is in the APA [i.e., 5 U.S.C. § 702]."); *COMSAT Corp. v. NSF*, 190 F.3d 269, 277-78 (4th Cir. 1999) ("[I]t is sovereign immunity...that gives rise to the Government's power to refuse compliance with a subpoena."; "The APA waives sovereign immunity and permits a federal court to order a non-party agency to comply with a subpoena if the government has refused production in an arbitrary, capricious, or otherwise unlawful manner.").

*Mar. Bd. v. Isbrandtsen Co.*, 356 U.S. 481, 499 n.16 (1958) ("Certainly it must be assumed that the Court would refrain from settling sub silentio an issue of such obvious importance and difficulty plainly requiring a clearly expressed disposition.").  Indeed, this Circuit has so held in the sovereign immunity context itself.  *See Adeleke v. U.S.*, 355 F.3d 144, 149-51 (2d Cir. 2004) (sovereign immunity barred certain claims, even while acknowledging prior cases that had assumed justiciability of such claims).

Second, the doctrine could not properly have been asserted in any of the cases cited by the District Court because those cases involved a grand jury[11] or congressional[12] subpoena.  The authority for the issuance of those subpoenas is rooted in the Constitution,[13] and the Constitution displaces the common law sovereign immunity.  *See generally Library of Congress v. Shaw*, 478 U.S. 310,

---

[11]  *Gravel v. U.S.*, 408 U.S. 606 (1972); *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).

[12]  *Senate Select Comm. v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974); *Comm. v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013); *Comm. v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008); *U.S. v. House*, 556 F. Supp. 150 (D.D.C. 1983).

[13]  Grand Jury.  *See* U.S. Const. amend. V; *Branzburg v. Hayes*, 408 U.S. 665, 687 (1972) (noting "[t]he adoption of the grand jury in our Constitution as the sole method for presenting charges in serious criminal cases"); *accord Costello v. U.S.*, 350 U.S. 359, 362 (1956).  Congressional.  *See* U.S. Const. art. I, § 1; *Watkins v. U.S.*, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process."); *McGrain v. Daugherty*, 273 U.S. 135, 161, 174-75 (1927) ("[T]he power of inquiry – with process to enforce it – is an essential and appropriate auxiliary to the legislative function.").

317 & n.5 (1986) (sovereign immunity gives way to constitutional provisions), *superseded, in irrelevant part, by statute* Pub. L. No. 102-166, § 114, 105 Stat. 1072 (1991); *Larson*, 337 U.S. at 701-02 (same, insofar as action seeks declaratory and/or injunctive relief).  In other words, the cases relied on by the District Court (for their silence) are wholly inapposite here:  This case, unlike those cases, involves only administrative subpoenas issued by a statutorily-created agency – i.e., a situation where the sovereign immunity doctrine remains in full effect.

Finally, the District Court cited House Rule VIII.  *See* JA118-19; *cf.* SEC D.Ct. Opening Mem. (not citing Rule VIII); SEC D.Ct. Reply (same).  Rule VIII, which concerns demands for House information, expressly is not a waiver of any rights, much less a basis for creating an intra-governmental exception to the sovereign immunity doctrine:  "Nothing in this rule shall be construed to deprive, condition, or waive the constitutional or legal privileges or rights applicable or available to [the House]."  House Rule VIII.8.  Rather, the Rule simply requires the reporting, to the Speaker of the House, of certain subpoenas relating to official House business, with a default, self-imposed direction to the House recipient to comply in those circumstances (unlike here) in which the subpoena constitutes "a proper exercise of jurisdiction," demands "material and relevant" information, and "is consistent with the privileges and rights of the House."  *Id.* Rule VIII.2, .6(a); *see also id.* Rule VIII.1 (expressly stating that Rule provides for compliance,

23

"unless otherwise determined under this rule").  In short, there is no plausible

reading of Rule VIII that suggests that the House has acceded, or ever would

accede, to any newfound intra-governmental exception to the sovereign immunity

doctrine.[14]

    B.    <u>Waiver</u>.  Alternatively, the District Court concluded, following a

footnote suggestion by the SEC, *see* JA119-22; SEC D.Ct. Opening Mem. at 23

n.6; SEC D.Ct. Reply at 5-6, that Congress waived its sovereign immunity

protection from administrative subpoenas by enacting the STOCK Act, Pub. L. No.

112-105, 126 Stat. 291 (2012).  This conclusion defies the law of the Supreme

Court and this Court.

    As noted, *supra* nn.5-8 & accompanying text, the Supreme Court has long

required that any waiver be "unequivocally expressed in statutory text," with

"[a]ny ambiguities in the statutory language...construed in favor of immunity."

*Cooper*, 132 S. Ct. at 1448 (quotation marks omitted).  Accordingly, in enacting,

---

[14]  House Rule VIII continues the House's historic treatment of subpoenas.  *See, e.g.*, CONSTITUTION, JEFFERSON'S MANUAL, AND RULES OF THE HOUSE OF REPRESENTATIVES, H.R. Doc. No. 113-181, at 412-13 (2015) (noting historical practice whereby House, by resolution, would address incoming subpoenas on subpoena-by-subpoena basis; further noting recent shift to default "authoriz[ation]" to respond, but only where specified conditions satisfied), https://www.gpo.gov/fdsys/pkg/HMAN-114/pdf/HMAN-114.pdf; *see also, e.g.*, 17 Cong. Rec. 1295 (1886) (resolving:  "That by the privilege of this House no evidence of a documentary character under the control and in possession of the House...can by the mandate or process of the ordinary courts of justice be taken from such control or possession but by its permission.").

via the APA, the "only identifiable waiver" of federal sovereign immunity with respect to subpoenas, *EPA*, 197 F.3d at 598, Congress was explicit:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or officer or employee thereof acted or failed to act in an official capacity or under color of legal authority *shall not be dismissed nor relief therein be denied on the ground that it is against the United States* or that the United States is an indispensable party. *The United States may be named as a defendant in any such action, and judgment or decree may be entered against the United States*.

5 U.S.C. § 702 (emphases added). It was equally explicit that that waiver did not apply to Congress, and no one has suggested that it does. *See supra* Argument, Part I.A.4 (citing 5 U.S.C. § 701(b)(1)(A)).

In the STOCK Act, by contrast, Congress provided no similar waiver. Rather, Congress simply reiterated that Legislative Branch officials are subject to "the insider trading prohibitions" of the securities law – and, more particularly, that Legislative Branch officials owe the "duty" required to make those insider trading prohibitions applicable, *see generally Newman*, 773 F.3d at 445-46. Accordingly, Congress enacted the following:

> AFFIRMATION OF NONEXEMPTION.--Members of Congress and employees of Congress are not exempt from *the insider trading prohibitions* arising under the securities laws, including section 10(b) of the [Exchange Act] and Rule 10b-5 thereunder.

25

STOCK Act § 4(a) (emphasis added); *see also id.* § 4(b)(1) ("The purpose of the amendment made by this subsection is to affirm a duty arising from a relationship of trust and confidence owed by each Member of Congress and each employee of Congress."); *id.* § 4(b)(2) (stating relevant duty: "Subject to the rule of construction under section 10 of the STOCK Act and solely for the purposes of the insider trading prohibitions arising under the [Exchange Act]…, each Member of Congress or employee of Congress owes a duty...with respect to material, nonpublic information derived from such person's position as a Member of Congress or employee of Congress or gained from the performance of such person's official responsibilities.").

That's it: The STOCK Act says absolutely nothing about any waiver of sovereign immunity by any Legislative Branch entity or person with respect to an investigative subpoena or subpoena enforcement action, much less any particular remedy in connection with any such investigation or action. And the Supreme Court's decisions, and those of this Court, leave no room for any waiver to be inferred from the STOCK Act.

In *U.S. Department of Energy*, Ohio sought the imposition of civil fines against the Department of Energy for the Department's past violations of the CWA. *See* 503 U.S. at 612. Ohio noted that the CWA expressly (i) permitted claims "'against any person (including...the United States),'" (ii) provided federal

26

courts with "'jurisdiction...to apply civil penalties'" in connection with such claims, and (iii) provided that "'[e]ach department, agency, or instrumentality of the...Federal Government...shall be subject to, and comply with, all...requirements, administrative authority, and processes and sanctions respecting [relevant pollution limits].'" *Id.* at 615-16, 620 (quoting 33 U.S.C. §§ 1365(a), 1323(a)). Notwithstanding all that, the Court held that Congress had not waived sovereign immunity regarding the requested fines, in that the contemplated fines were punitive in nature (would be imposed for *past* wrongdoing), and it was plausible that the statutory language (expressly subjecting the federal government to "civil penalties" and "sanctions") was meant to encompass only fines coercive in nature (imposed to encourage *future* compliance). *Id.* at 615-20, 620-27 ("The rule of narrow construction therefore takes the waiver no further than the coercive variety.").[15]

---

[15]  Ohio suggested still another relevant statutory waiver:

> "[Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government] shall be subject to, and shall comply with, all...requirements, both substantive and procedural (including...such sanctions as may be imposed by a court to enforce such relief)...in the same manner, and to the same extent, as any person is subject to such requirements.  Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of such injunctive relief."

*(Continued...)*

In reaching its *U.S. Department of Energy* holding, the Supreme Court emphasized that any sovereign immunity waiver must be construed narrowly and that such waivers must be parsed as to whether they reach "substan[ce]," "process," "procedur[e]," "administrati[on]," and/or particular remedies, including "sanctions." 503 U.S. at 622-23; *id.* at 623 ("Substantive requirements are thus distinguished from judicial process...."). Any ambiguity regarding whether the waiver reaches a particular aspect of sovereign immunity leaves that aspect in place. *See id.*

The Supreme Court has been steadfast in its insistence that waivers be "unequivocally expressed." Accordingly, (i) a statute that permitted the award of "actual damages" against federal agencies did not waive sovereign immunity as to "damages for mental or emotional distress"[16]; (ii) a statute that permitted "join[ing] the United States as a necessary party defendant in any suit to adjudicate" certain rights (with the United States in such cases "waiv[ing] any right to plead that it is not amenable thereto by reason of its sovereignty") did not waive sovereign immunity as to a lawsuit to enforce such rights "directly against the United

---

503 U.S. at 627 (quoting 42 U.S.C. § 6961). Again, the Supreme Court – unanimously on this issue – found such language inadequate to provide a waiver for the proposed fines: "'[A]ll...requirements' can reasonably be interpreted as including substantive standards and the means for implementing those standards, but excluding punitive measures." *Id.* at 627-28 (some quotation marks omitted).

[16] *Cooper*, 132 S. Ct. at 1446, 1448, 1453.

28

States"[17]; (iii) a statute that permitted claims against the federal government for relief "other than money damages" did not waive sovereign immunity as to a lawsuit seeking a lien on government property[18]; (iv) a statute that permitted "any claim....notwithstanding any assertion of sovereign immunity" did not waive sovereign immunity as to "monetary claims"[19]; and (v) a statute that permitted recovery against the federal government of "a reasonable attorney's fee," where "the United States shall be liable for costs the same as a private person," did not waive sovereign immunity as to awards of interest with respect to such fees.[20]

This Circuit has followed the Supreme Court. In *Beaulieu v. Vermont*, 807 F.3d 478 (2d Cir. 2015), this Court considered claims against the State of Vermont for violations of the FLSA. This Court acknowledged that Vermont, in its own statutes, had recognized the applicability of the substantive law provisions of the FLSA. *See* 807 F.3d at 484. Notwithstanding, however, this Court held that Vermont had not "expressly" waived sovereign immunity with respect to enforcement of those provisions:

> Vermont's statutory reference to the fact that some of its
> employees are covered by the FLSA *implicitly*

---

[17]  *Orff v. U.S.*, 545 U.S. 596, 601-04 (2005).

[18]  *Blue Fox*, 525 U.S. at 260-63.

[19]  *Nordic Village*, 503 U.S. at 32, 34, 38.

[20]  *Library of Congress*, 478 U.S. at 313-16, 318; *accord Ikelionwu v. U.S.*, 150 F.3d 233, 239 (2d Cir. 1998).

> *acknowledges its legal obligations under federal law, but says nothing about how that obligation may be enforced against it.* It does not constitute an implicit, much less an explicit[,] waiver of its sovereign immunity from private suit.

*Id.* at 484-85 (emphasis added); *see also, e.g.*, *Catskill Dev., LLC v. Park Place Entm't Corp.*, 206 F.R.D. 78, 87 (S.D.N.Y. 2002) ("By making Indians subject to federal prosecution for certain crimes, Congress did not address implicitly, much less explicitly, the amenability of the tribes to the processes of the court in which the prosecution is commenced." (quotation marks omitted)).

In sum, there is no legal basis for the District Court's conclusion that the STOCK Act provides an "unequivocally expressed" waiver of sovereign immunity as to any procedural, administrative, or other process-based efforts that the SEC might undertake against the Legislative Branch, much less any remedial efforts (like this enforcement action) that the SEC might invoke. At the very least, "plausible" readings of the STOCK Act exist that do not provide such a waiver, and that is all that is required to retain immunity. *Cooper*, 132 S. Ct. at 1448, 1453.

## II. The Speech or Debate Clause Bars Enforcement of the SEC's Subpoenas.

Because the documents and testimony demanded concern actions by the Committee and Sutter "within the sphere of legitimate legislative activity," the

30

Speech or Debate Clause provides an independent, and "absolute," bar against their compelled production. *Eastland*, 421 U.S. at 501, 503, 506, 509-10 & n.16.

The District Court recognized the Clause's applicability, *see* JA137-64, but simultaneously, and erroneously, held that certain documents and testimony demanded by the SEC lie outside its protections, and, further, that the Committee and Sutter would have to log withheld documents, *see* JA165-71,177.

## A.    Constitutional Overview.

The Clause is rooted historically in the suppression and intimidation of Members of Parliament by English monarchs in the 16th- and 17th-centuries. *See U.S. v. Johnson*, 383 U.S. 169, 178 (1966); *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). As a result of the English experience, "[f]reedom of speech and action in the legislature was taken as a matter of course" by the Founders, and reflected in the Clause. *Tenney*, 341 U.S. at 372-73.

"The purpose of the Clause is to [e]nsure that the legislative function the Constitution allocates to Congress may be performed *independently*." *Eastland*, 421 U.S. at 502. Its "'central role'" is to "'prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary.'" *Id.* (quoting *Gravel*, 408 U.S. at 617). The Clause thus "reinforce[s] the separation of powers so deliberately established by the Founders." *Johnson*, 383 U.S. at 178; *accord U.S. v. Brewster*, 408 U.S. 501, 507-08 (1972); *U.S. v. Helstoski*, 442 U.S. 477,

31

491 (1979); *U.S. v. Myers*, 635 F.2d 932, 935-36 (2d Cir. 1980) ("Like the Speech or Debate Clause, the doctrine of separation of powers serves as a vital check upon the Executive and Judicial Branches to respect the independence of the Legislative Branch, not merely for the benefit of the Members of Congress, but, more importantly, for the right of the people to be fully and fearlessly represented by their elected Senators and Congressmen.").

Because the values the Clause serves are so "vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such important values require." *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979). Accordingly, the Supreme Court has required, "[w]ithout exception,...[that the Clause be] read...broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501; *accord Doe v. McMillan*, 412 U.S. 306, 311 (1973); *Gravel*, 408 U.S. at 617-18; *Johnson*, 383 U.S. at 179; *see also, e.g.*, *Myers*, 635 F.2d at 937 (same).

In keeping with this sweeping mandate, the Supreme Court has construed the Clause to encompass the following enduring features and elements (among others):

1.     The Clause provides three broad protections: (i) an immunity, applicable in fora outside the Legislative Branch, for all "actions [taken] within the 'legislative sphere,'" *McMillan*, 412 U.S. at 312 (quoting *Gravel*, 408 U.S. at 624-25); *see also, e.g.*, *Eastland*, 421 U.S. at 503 (same); (ii) a non-evidentiary use

32

privilege that bars litigants from advancing their cases or claims against Legislative Branch officials or entities by "[r]evealing information as to a legislative act," *Helstoski*, 442 U.S. at 490; *see also Johnson*, 383 U.S. at 173-77 (same); and (iii) a nondisclosure privilege regarding legislative information, *see, e.g.*, *Gravel*, 408 U.S. at 615-16 (quashing subpoena insofar as it sought testimony regarding legislative matters).[21]

The Court has drawn no distinctions among these protections in terms of effect. Rather, it has held unequivocally that, when the Clause applies, it is

---

[21] While the Supreme Court has not had occasion to apply the non-disclosure component of the privilege to demands for documents, as opposed to testimony, the SEC below did not contest, other than in a footnote to its reply brief, that the privilege covers documents in the same manner as it covers testimony. *See* SEC D.Ct. Reply at 14 n.11. Notwithstanding that the SEC thereby waived this argument, *see, e.g.*, *Rowley v. City*, No. 00CIV.1793(DAB), 2005 WL 2429514, at *5-6 (S.D.N.Y. Sept. 30, 2005), the District Court considered it, holding – correctly – that the Clause "provides a non-disclosure privilege for documents that fall within the sphere of legitimate legislative activity." JA153-64 (quotation marks omitted). The SEC did not appeal, or cross-appeal, from that holding, thereby again abandoning any objection to it. *See, e.g.*, *U.S. v. Velazquez*, 246 F.3d 204, 216 (2d Cir. 2001) ("[A]n appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary…." (quotation marks omitted); *see also, e.g.*, *In re Grand Jury Subpoenas*, 571 F.3d 1200, 1203 (D.C. Cir. 2009) (non-disclosure component protects documents); *U.S. v. Rayburn*, 497 F.3d 654, 655, 660, 662 (D.C. Cir. 2007) (same; Clause encompasses "non-disclosure privilege for written materials"; "[T]here is no distinction between oral and written materials within the legislative sphere...."); *Brown & Williamson Tobacco Corp. v. Williams* ("*B&W*"), 62 F.3d 408, 420 (D.C. Cir. 1995) (same; "Document[s]...can certainly be as revealing as oral communications."); *MINPECO v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859-61 (D.C. Cir. 1988) (same).

"absolute." *Eastland*, 421 U.S. at 501, 503, 509-10 & n.16; *accord McMillan*, 412

U.S. at 324; *Gravel*, 408 U.S. at 623 n.14.

      2.    The three protections apply to all activities "within the

'legislative sphere,'" *McMillan*, 412 U.S. at 312 (quoting *Gravel*, 408 U.S. at 624-

25), which it broadly has defined to encompass all activities that are

> "an integral part of the deliberative and communicative
> processes by which Members participate in committee
> and House proceedings with respect to the consideration
> and passage or rejection of proposed legislation or with
> respect to other matters which the Constitution places
> within the jurisdiction of either House."

*Eastland*, 421 U.S. at 504 (quoting *Gravel*, 408 U.S. at 625).

      "The power to investigate...plainly falls within that definition [of legitimate

legislative activity]." *Eastland*, 421 U.S. 504-05 (Clause immunizes congressional

committee engaged in information-gathering); *McMillan*, 412 U.S. at 313 (same).

Protected information-gathering encompasses both formal Committee processes,

*see, e.g.*, *Eastland*, 421 U.S. at 504, and less formal investigations by committees

and individual Members, *see, e.g.*, *U.S. v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988)

("[L]egislative factfinding activity conducted by [Representative] Biaggi during

his Florida trips was protected [under the Clause]."); *B&W*, 62 F.3d at 411-12, 423

(documents voluntarily delivered to committee by private citizen protected);

*McSurely v. McClellan*, 553 F.2d 1277, 1287 (D.C. Cir. 1976) (en banc)

("[A]cquisition of knowledge through informal sources is a necessary concomitant

34

of legislative conduct and thus should be within the ambit of the [Speech or Debate] privilege so that congressmen are able to discharge their constitutional duties properly." (quotation marks omitted)).[22]

        3.     Beyond legislative activities themselves, the Clause also protects "against inquiry into...the motivation for those [legislative] acts." *Helstoski*, 442 U.S. at 489 (quotation marks omitted); *see also Brewster*, 408 U.S. at 538 (whether legislative activity improperly motivated "is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry" (quotation marks omitted)); *Johnson*, 383 U.S. at 180, 184-85 (similar); *X-Men v. Pataki*, 196 F.3d 56, 71-72 (2d Cir. 1999) (similar).

---

[22] *See also, e.g.*, *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 520-21 (3d Cir. 1985) (fact-finding by individual legislator protected); *Miller v. Transamerican*, 709 F.2d 524, 530 (9th Cir. 1983) ("Obtaining information pertinent to potential legislation or investigation is one of the things generally done in a session of the House, concerning matters within the legitimate legislative sphere." (quotation marks and citations omitted)); *U.S. v. Dowdy*, 479 F.2d 213, 223-24 (4th Cir. 1973) (Member's informal gathering of information from federal agencies in furtherance of legislative functions protected); *Benford v. Am. Broad. Cos.*, 102 F.R.D. 208, 210 (D. Md. 1984) ("[I]nformation possessed by them [unpaid, volunteer committee investigators] and transmitted to, or received by, them in the execution of legislative functions, including legitimate information-gathering, is Constitutionally privileged from discovery in this lawsuit...."); *Webster v. Sun*, 561 F. Supp. 1184, 1189-90 (D.D.C. 1983) (receipt of information from lobbyist protected), *vacated and remanded on other grounds*, 731 F.2d 1 (D.C. Cir. 1984); *United Transp. v. Springfield*, Nos. 87-cv-03442P & 88-cv-0117P, 1989 WL 38131, at *1-2 (D. Me. Mar. 13, 1989) (monitoring of labor developments by individual Member and staff protected).

4.     The protections of the Clause apply "to [a Member's] aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Gravel*, 408 U.S. at 618; *see also, e.g.*, *Eastland*, 421 U.S. at 507 (Senate committee aide, as well as Senators themselves, immune from suit under Clause; "We draw no distinction between the Members and the Chief Counsel.").

5.     Finally, the protections of the Clause apply "even though the[] conduct [in question], if performed in *other* than legislative contexts, would...be unconstitutional or otherwise contrary to criminal or civil statutes." *McMillan*, 412 U.S. at 312-13 (emphasis added); *see also, e.g.*, *Eastland*, 421 U.S. at 492-501 (applying Clause to immunize Members and staff where plaintiffs alleged, and lower court held, that committee investigative conduct violated plaintiffs' constitutional rights).  In so holding, the Court has acknowledged the potential costs associated with this broad constitutional protection.  *See, e.g.*, *Helstoski*, 442 U.S. at 488 ("[W]ithout doubt the exclusion of [legislative act] evidence will make prosecutions more difficult."); *Eastland*, 421 U.S. at 510 ("[T]he broad protection granted by the Clause creates a potential for abuse.").  Nevertheless, the Court steadfastly has held that the Clause *must* be broadly construed and applied because that was "'the conscious choice of the Framers' buttressed and justified by history." *Id.* (quoting *Brewster*, 408 U.S. at 516).

36

**B.      The Immunity Protection Bars These Subpoenas.**

In light of the Committee's legislative responsibilities and activities, *see supra* Statement of the Case, Parts I-II, this enforcement action plainly is predicated on a claimed right to documents and testimony that constitute or reflect Committee legislative activities.  As a result, the Committee and Sutter are absolutely protected by the immunity component of the Clause:  "[O]nce it is determined that the Members are acting within the legitimate legislative sphere, the Speech or Debate Clause is an absolute bar to interference." *Eastland*, 421 U.S. at 503 (quotation marks omitted); *see generally* Argument, Part II.A.

The Court's role in determining whether the Committee's and Sutter's activities, into which the SEC seeks to probe, were legislative (and thus Speech or Debate protected) is exceedingly limited, and particularly so here, in the committee context:  "The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Eastland*, 421 U.S. at 506 (quotation marks omitted); *see also, e.g.*, *Biaggi*, 853 F.2d at 103 ("[T]he Speech or Debate Clause forbids not only inquiry into acts that are manifestly legislative but also inquiry into acts that are purportedly legislative, even to determine if they are legislative in fact...." (quotation marks omitted)); *Dowdy*, 479 F.2d at 226 ("Once it [i]s determined...that the legislative function...was *apparently* being performed, the propriety and the motivation for the

37

action taken, as well as the detail of the acts performed, are immune from judicial inquiry.").

Here, the Committee considered, in the relevant Congress (and continuing into this Congress), various legislative proposals that dealt not only with DHHS, CMS, and Medicare, but dealt particularly with CMS's rate-setting with respect to the SGR and the MA program. *See supra* Statement of the Case, Part II. To consider such proposals, the Committee necessarily had to gather information – including from lobbyists – so that it could make informed decisions about the need for legislation and, where appropriate, the content of any such legislation. These activities lie at the very heart of the "sphere of legitimate legislative activity." *See generally supra* Argument, Part II.A.2; *Eastland*, 421 U.S. at 504 ("[A] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." (quotation marks omitted)); *Dowdy*, 479 F.2d at 224 ("This evidence was an examination of defendant's actions as a Congressman, who was chairman of a subcommittee investigating a complaint, in gathering information in preparation for a possible subcommittee investigatory hearing. As such, it was an examination of legislative acts....").

Such information-gathering in furtherance of legislative activities is protected whenever the subject of the inquiry is "one 'on which legislation could

be had,'" *Eastland*, 421 U.S. at 504 n.15, 506 (quoting *McGrain*, 273 U.S. at 177),

regardless of whether legislation is actually produced, *see id.* at 509 ("Nor is the

legitimacy of a congressional inquiry to be defined by what it produces. The very

nature of the investigative function – like any research – is that it takes the

searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid

legislative inquiry there need be no predictable end result."). Here, there can be no

question that the topics about which the SEC seeks to inquire constitute

information-gathering in furtherance of matters within the Committee's

jurisdiction "on which legislation could be had," *id.* at 506 – and, in fact, was had.

*See supra* Statement of the Case, Part II.[23]

Accordingly, the Committee and Sutter are absolutely immune from the

SEC's enforcement action, and the Clause requires that this action be dismissed.

---

[23] *See also, e.g.*, *B&W*, 62 F.3d at 418-19 (quashing document subpoena to
subcommittee Members: "Once the legislative-act test is met,...the privilege is
absolute...." (quotation marks omitted)); *MINPECO*, 844 F.2d at 861 (quashing
subpoena for subcommittee documents and testimony: "As the [activity] was part
of the legislative process, that is the end of the matter."); *U.S. v. Peoples Temple*,
515 F. Supp. 246, 249 (D.D.C. 1981) (quashing subpoena for congressional
documents: "The Supreme Court has rarely spoken with greater clarity. Once it is
determined...that [the congressional individual or entity's] actions fall within the
legitimate legislative sphere, judicial inquiry is at an end." (quotation marks
omitted)).

### C.     The Non-Disclosure Protection Also Bars These Subpoenas.

Even if the Clause's immunity protection did not bar these subpoenas (as it does), the Clause's non-disclosure protection would compel the same result. Indeed, the District Court's effort to locate within the Committee's files, and within the minds of its senior staff, some discoverable information – where any such information exists solely because the Committee investigated and legislated regarding the same subject matter now drawing the SEC's interest – serves only to underscore the dangers of such parsing, and the reasons the Supreme Court and this Court have barred it.

More particularly, the District Court, erroneously: (1) (a) directed the parsing of conversations depending on the identity of the immediate speaker, (b) required the production of information regarding any attempt to influence the Executive Branch, and (c) prescribed the production of three additional, assorted types of information; and (2) ordered the production of a privilege log.  *See* JA165-71,177.

1.a.    As to Sutter's communications with Greenberg, the District Court recognized that communications "from Greenberg to Sutter" constitute protected information-gathering, but held that "Sutter's statements to...Greenberg" do not. JA165.  Not only is that not a "broad" reading of the Clause, *see supra* Argument,

40

Part II.A, it ignores the realities of human communication and congressional investigations.

A typical email chain (or oral conversation, for that matter) might involve Sutter inquiring about a particular topic, the Greenberg representative providing responsive information, Sutter following up with particular questions regarding that information (which follow-up itself often will reveal the information just provided), and so on. In other words, under the District Court's approach, the protections of the Clause – which must always be read "broadly" to ensure the protection of the "vitally important" interests that they secure, *see supra* Argument, Part II.A – would be reduced to a series of partially redacted conversations by which the Committee is forced to reveal what it is investigating, what particular inquiries it has made in connection with that investigation, and much of what it has learned, not to mention its reactions to that information.

That is decidedly not the approach mandated by the Supreme Court, particularly in the committee investigative context, where Congress is inherently dependent on gathering information from outside the Legislative Branch. *See, e.g.*, *Eastland*, 421 U.S. at 504-05 ("[W]here the legislative body does not itself possess the requisite information – which not infrequently is true – recourse must be had to others who do possess it." (brackets in original; quotation marks omitted)). That dependence, coupled with the District Court approach, would permit the wide-

41

scale compelled disclosure of legislative activity, an approach the courts

resoundingly have rejected. *See, e.g.*, *id.* at 492-501, 503, 509-10 & n.16

(protections of the Clause "absolute"; so holding even where committee

investigative conduct allegedly violates constitutional rights); *see also, e.g.*, *supra*

Argument, Part II.B.[24]

    1.b.   The District Court also misread the law in concluding that any efforts

"'to influence the [Executive Branch]'" lie outside the Clause. JA166,167 (quoting

*Gravel*, 408 U.S. at 625; brackets in original). While the District Court quoted

*Gravel*, it quoted only part of the relevant sentence, which reads in full:

---

[24]  The District Court apparently relied on cases holding that the following conduct may lie outside the protections of the Clause: (i) the distribution of material to the general public, and (ii) the provision of assistance to constituents in navigating the federal bureaucracy. *See* JA151-52,165. Both types of cases are plainly inapt.

Regarding the first, the Committee's one-on-one, or small group, information-gathering conversations bear no resemblance to the "distribut[ion]…to the public generally" type activities sometimes held outside the Clause. *McMillan*, 412 U.S. at 312-13, 316-17 (Clause immunizes committee Members and staff regarding various investigative conduct; noting only that subsequent public-at-large distribution, by non-committee staff, of summary report fell outside that immunity, where such distribution unnecessary "to perform [Congress's] legislative function"); *see also Gravel*, 408 U.S. at 625-26 (same regarding Member's "private publication," after completion of committee work); *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979) (same regarding Member's distribution of newsletters and press releases); *accord Chastain v. Sundquist*, 833 F.2d 311, 314 (D.C. Cir. 1987).

Regarding the second, the Committee is not an individual Member and Sutter did not work for one; the Committee necessarily has no constituents but, instead, exists solely to perform legislative activity. *See Brewster*, 408 U.S. at 512 (constituent "errands" generally non-legislative).

> "No argument is made, nor do we think that it could be
> successfully contended, that the Speech or Debate Clause
> reaches conduct, such as was involved in the attempt to
> influence [DOJ], *that is in no wise related to the due
> functioning of the legislative process*."

408 U.S. at 625 (emphasis added; quoting *Johnson*, 383 U.S. at 172). In other

words, attempts to influence the Executive Branch are not necessarily legislative

(they may, for example, constitute mere constituent-service type efforts to

influence the administration of the law); rather, they are legislative only where

"related to the due functioning of the legislative process." *Id.* (quotation marks

omitted).

That *Gravel* did not re-write the general "legislative activity" test, *see supra*

Argument, Part II.A.2, in the singular instance of interactions with the Executive

Branch is clear from (i) the *Johnson* case from which *Gravel* borrowed the above-

quoted language, (ii) *Gravel* itself, (iii) subsequent Supreme Court

pronouncements, and (iv) logic and common sense.

First, the language quoted from *Johnson* simply described conduct that the

defendant Member there did not challenge as Speech or Debate protected –

namely, the Member's alleged efforts to assist, in exchange for money, an indicted

home-state "loan company and its officers" by approaching the Attorney General

to "urge" his reconsideration. 383 U.S. at 171-72. That such conduct is not

legislative in no way suggests that *all* efforts to influence or interact with the

43

Executive Branch are non-legislative; indeed, *Johnson* itself stands for the opposite proposition: The Supreme Court there held that the Clause did protect other conduct allegedly designed to influence the Executive Branch, because that conduct was legislative in nature (namely, the giving of a speech on the floor of the House). *See id.* at 170-77.

Second, *Gravel* quoted *Johnson* in the same vein. *See* 408 U.S. at 625. Indeed, in the same paragraph as the above-quoted language, the *Gravel* Court emphasized that it is only where Members "cajole[] and exhort with respect to the *administration* of a federal statute" that the Clause is not applicable. *Id.* (emphasis added). The Court did nothing to suggest that cajoling or exhorting the Executive Branch *with respect to legislative activity* – e.g., committee information-gathering – would lie outside the Clause. *See id.* In fact, it said the opposite: "[The Clause] reach[es] anything generally done in a session of the House by one of its members in relation to the business before it." *Id.* at 624; *id.* at 616 ("Senator Gravel may not be made to answer – either in terms of questions or in terms of defending himself from prosecution – for the events that occurred at the subcommittee meeting."; no exception made for any attempts to influence Executive Branch, whether via "cajoling" or "exhorting" Executive Branch witnesses, or otherwise).

44

Third, the Supreme Court subsequently has described why information-gathering, *particularly from the Executive Branch*, lies at the heart of protected legislative activity:

> Unless Congress have and use every means of acquainting itself with *the acts and the disposition of the administrative agents of the government*, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct.

*Hutchinson*, 443 U.S. at 132-33 (emphasis added; quotation marks omitted).

Fourth, logic and common sense dictate that the Supreme Court's statements must be construed in this manner. The Executive Branch is the operational arm of the federal government. *See* U.S. Const. art. II. One of Congress's primary functions is to prescribe the functions and activities which it expects the Executive Branch to perform, to create programs which the Executive Branch much administer, and to pass appropriations bills to fund those functions, activities, and programs. *See* U.S. Const. art. I. To do those things, Congress, on a daily basis, necessarily cajoles and exhorts the Executive, gathers information from the Executive, and exchanges ideas with the Executive. And all of those actions by Congress self-evidently are within the sphere of legitimate legislative activity. Indeed, they constitute the very core of legislative activity.

45

Accordingly, the test for the applicability of the Clause remains the same in the "influenc[ing] the Executive Branch" context, JA166 (quotation marks omitted), as anywhere else, as the Supreme Court has reiterated (including after *Gravel*):

> The question to be resolved is whether the actions of the [Legislative Branch official(s)] fall within the sphere of legitimate legislative activity. If they do, the [Legislative Branch official(s)] "shall not be questioned in any other Place" about those activities since the prohibitions of the Speech or Debate Clause are absolute.

*Eastland*, 421 U.S. at 501 (footnote omitted; quoting Clause; other quotation marks omitted). Here, the Committee's contact with the Executive Branch necessarily occurred in the context of its legislative activity, *see supra* Statement of the Case, Parts I, II; Argument, Part II.A.2, and thus the Clause applies.

1.c.　Finally, none of the three additional means by which the District Court ordered the parsing of the Committee's legislative activity withstands scrutiny. *See* JA166-70.

- As to the existence of "personal" or "administrative" information, such information is only possible here in the context of Sutter's communications with Greenberg, because any communications about rate-setting generally, *see* JA167, and with CMS about similar issues,

46

*see* JA166,[25] necessarily are not "personal" or "administrative" in nature. And the possibility that any communications with Greenberg might contain personal or administrative information – e.g., communications about family, sports, the weather, or a job applicant – serves only to underscore the improper breadth of the subpoenas, in that the SEC can have no legitimate investigatory interest in any such communications.

- As to communications involving the potential confirmation of a new CMS director (Tavenner), any Committee information again necessarily is neither personal nor administrative (nor a form of constituent service); rather, the Committee would have any such information solely in its singular, legislative capacity: regarding the necessity of legislation, if any, in light of the prospect of such confirmation. *See generally supra* Statement of the Case, Parts I, II.

- And, as to certain records regarding telephones assigned to Sutter, again these – like with any communications with Greenberg – are necessarily legislative in nature or, if personal or administrative (e.g.,

---

[25] While the SEC demanded Sutter's communications with CMS no matter the subject matter, *see supra* Statement of the Case, Part III, the District Court limited the subject matter, *see* JA165.

calls with family), then of no possible relevance to the SEC's
investigation.

\*　　\*　　\*

The approach of the D.C. Circuit (applying Supreme Court law) in
analogous circumstances is instructive:  In *MINPECO*, 844 F.2d at 857-58, the
D.C. Circuit considered subpoenas demanding documents and testimony related to
a House committee's investigative activity (and alleged "irregularities" in that
activity; i.e., the alleged alteration of a committee deposition transcript).  The D.C.
Circuit noted that the relevant subpoenas were drafted with sufficient breadth to
encompass (i) information regarding the transmittal of certain documents to the
Executive Branch, for the purpose of requesting that that branch take a particular
administrative action, *see* 844 F.2d at 861-62, and (ii) some information beyond
the relevant committee investigation, *see id.* at 862-63.  Notwithstanding, the D.C.
Circuit affirmed the quashing of the subpoenas, in full.  *See id.* at 861-63.  The
Court's analysis was straightforward:  The committee was engaged in investigative
activity (just as was the Committee here) and, under controlling Supreme Court
law, "that is end of the matter."  *Id.* at 861; *see also id.* at 862-63 ("[E]ven though
the language of the subpoenas is broad enough to encompass documents that do
not relate to [probing particular committee investigative activity], the effect of their

48

literal enforcement would be to authorize a fishing expedition into congressional files.").[26]

2.      Finally, the clear applicability of the Clause – particularly in light of the "narrow" inquiry permitted, *Eastland*, 421 U.S. at 506; *supra* Argument, Part II.B – leaves no room (and no need) for the District Court's privilege log order. *See* JA170-71.  Indeed, we are not aware of a single instance since the ratification of our Constitution that a court has directed a congressional committee to log Speech or Debate privileged documents, save one – and, in that one previous instance, the district court order promptly was reversed for lack of jurisdiction.  *See Benford v. Am. Broad. Cos.*, 98 F.R.D. 42 (D. Md. 1983), *rev'd for lack of jurisdiction In re Guthrie*, 733 F.2d 634, 636-37 (4th Cir. 1984).

The production of a privilege log would be inconsistent with the purposes that underlie the Clause, one of which is to "prevent...accountability before a possibly hostile judiciary."  *Eastland*, 421 U.S. at 502 (quotation marks omitted).  This is particularly true in the committee context where, because there are no

---

[26]  *See also, e.g.*, *Gravel*, 408 U.S. at 618 ("Rather than giving the Clause a cramped construction, the Court has sought to implement its fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator."); *B&W*, 62 F.3d at 420 ("[I]ndications as to what Congress is looking at provide clues as to what Congress is doing, or might be about to do – and this is true whether or not the documents are sought for the purpose of inquiring into (or frustrating) legislative conduct or to advance some other goals....").

"constituent errand" documents to cull, the Speech or Debate inquiry is particularly limited. Accordingly, courts have confined themselves to determining, at most, whether specific categories of documents reflect "legislative activities," as defined by the Supreme Court, on the basis of the subpoena language or the representations of Legislative Branch officials. *See, e.g.*, *MINPECO*, 844 F.2d at 859-63 (discussed in text above; no log required); *cf. In re Hubbard*, 803 F.3d 1298, 1307-11 (11th Cir. 2015) (holding – in applying common law legislative privilege for state lawmakers – that lawmakers need not "specifically designate[] and describe[]" documents, nor provide "affidavit").

In addition to these constitutional impediments, privilege logs are not practical in this context because it frequently is impossible to tell from the face of a particular document, or a brief description thereof, whether the document is legislative in nature. To make that document-by-document determination, a court necessarily would need to consider substantial in-and-of-itself privileged information, such that the log would swallow the privilege.[27]

---

[27] Of the three cases cited by the District Court, *see* JA170-71, only one arose in the committee context (the *Benford* case later reversed for lack of jurisdiction, as noted above) – and one of the other two cases arose in the unique circumstance in which the Executive Branch already, illegally, was in possession of an individual Member's documents. *See Rayburn*, 497 F.3d at 663.

50

## III.    The SEC Brought This Action in the Wrong Court.

If the SEC could have brought this action in any court (which it could not, for the reasons stated above), it was in the DDC, which court (i) could exercise personal jurisdiction over the Committee and Sutter, and (ii) serves the district in which they "reside[] or carr[y] on business," 15 U.S.C. § 78u(c).  But rather than bring this action in that district (with its particularly well-developed law barring any such action, *see supra* Argument, Parts I, II), the SEC instead brought it in the SDNY – a district to which neither the parties nor these particular subpoenas have any connection beyond the *SEC's* choice to "carr[y] on" *its* investigation out of an office within that district.  *Id.*

The District Court's holding that the Committee and Sutter must litigate this dispute in the SDNY, whether viewed in terms of personal jurisdiction or venue, wrongly prioritized the SEC's preference to enforce these subpoenas there above the serious "disruption to the work of Congress by the pendency of [this] action[] elsewhere than in Washington."  *Liberation News Serv. v. Eastland*, 426 F.2d 1379, 1384 (2d Cir. 1970).

A.    Personal jurisdiction requires, *first*, statutory authorization for service of process on the defendant, *see Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 218 (2d Cir. 2013), and, *second*, that the exercise of personal jurisdiction "comports with due process protections established under the

51

Constitution," *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015).

The authorization of service of process requirement is met here, *see* 15 U.S.C. § 78u(c) (authorizing nationwide service of process), but such authorization cannot alone support personal jurisdiction, *see* Wright & Miller, § 1068.1 ("[T]he mere existence of a nationwide service provision in the federal statute is obviously not sufficient to subject a defendant to personal jurisdiction."). Rather, the Due Process Clause, U.S. Const. amend. V, requires not only that the Committee and Sutter have "sufficient contacts with the forum…to justify the court's exercise of personal jurisdiction" over them, but also that the exercise of personal jurisdiction is "reasonable…under the circumstances of th[is] particular case." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012) (quotation marks omitted). Due process principles were not satisfied here.

With respect to "minimum contacts," this Court has held that the United States – not the state/judicial district where the action is brought – is the relevant "forum" when a federal statute authorizes nationwide service of process, as here. *See Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974) (construing 15 U.S.C.

52

§ 78aa(a)). Several circuits have disagreed with that conclusion,[28] and the

Committee and Sutter continue respectfully to preserve their challenge to it. *See*

House D.Ct. Opening Mem. at 17.

However, even where (indeed particularly where) the minimum contacts test

is rendered a virtual nullity by reference to contacts with the entire United States,

the District Court still was required carefully to evaluate the "reasonableness" of

forcing the Committee and Sutter to defend against this suit in the SDNY,

including particularly by reference to five factors:

> (1) the burden that the exercise of jurisdiction will
> impose on the defendant; (2) the interests of the forum
> [district] in adjudicating the case; (3) the plaintiff's
> interest in obtaining convenient and effective relief;
> (4) the interstate judicial system's interest in obtaining
> the most efficient resolution of the controversy; and
> (5) the shared interest of the states in furthering
> substantive social policies.

*Eades*, 799 F.3d at 169 (quotation marks omitted); *see, e.g.*, *U.S. Titan, Inc. v.*

*Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 & n.12 (2d Cir. 2001)

(analyzing reasonableness after finding nationwide minimum contacts). The

District Court did not do that. Instead, it effectively discarded "[t]he

reasonableness inquiry" by deeming it "largely academic in non-diversity cases

---

[28] *See, e.g.*, *Peay v. BellSouth*, 205 F.3d 1206, 1210-13 (10th Cir. 2000); *Panama v. BCCI*, 119 F.3d 935, 947 (11th Cir. 1997); *accord Willingway v. Blue Cross*, 870 F. Supp. 1102, 1106 (S.D. Ga. 1994).

brought under a federal law which provides for nationwide service of process." JA125 (quotation marks omitted).  That perfunctory treatment was erroneous for at least three reasons.

*First*, the District Court failed to account for the equally "strong federal interests" in minimizing undue intrusions upon Congress's legislative business. *See Liberation News*, 426 F.2d at 1384; *cf.* JA184,189 (recognizing that Congress "can claim to represent the public interest" and that "[t]here is also a strong public interest…in vindicating those provisions of our Constitution…that establish a separation of powers").  The District Court rightly "[a]cknowledg[ed]" that the Committee and Sutter "are located in or around the [DDC]," that "many of the events at issue in the Humana Investigation took place in that District," and that "many of the documents at issue are located in [D.C.]."  JA126.  But it then ignored the unique institutional burdens inherent in distant-forum suits brought against congressional committees (and their employees), who "operate predominantly in the capital" and lack the "large staffs" employed by "executive departments and agencies."  *Liberation News*, 426 F.2d at 1384.  Simply put, while any subpoena enforcement action would disrupt the Committee's official business, those disruptions necessarily and particularly compound when the Committee and its staff must defend themselves in a judicial district outside D.C.

54

*Second*, the District Court marginalized these additional, distant-forum burdens on the Committee and Sutter by presuming that "[t]he realities of modern transportation and communication, [and] the nature of civil litigation…, serve to reduce the burdens of litigating in a distant forum." JA126 (quotation marks omitted). Even if this presumption were valid, it cuts far more against the SEC, which is headquartered and heavily staffed in D.C., than it cuts against the Committee and Sutter, which and who lack any meaningful connection to, or resources in, New York. Moreover, this presumption recognizes that distant-forum burdens will persist despite "modern transportation and communication" – and, as explained above, the burdens in cases like this go beyond mere inconvenience to individual defendants by disrupting Congress's official business.

*Third*, the District Court also dismissed the distant-forum burdens on the Committee and Sutter by presuming that "enforcement proceedings" like this one "do not typically involve discovery, testimony from parties or witnesses, or the presentation of evidence." JA127 (quotation marks omitted). But the District Court's decision to require the production of a "privilege log" and "affidavit," *id.* at 69, and further reference to possible *in camera* review of any documents as to which "the SEC challenges Respondents' privilege designations," *id.*, means that it contemplated precisely the burdens it suggested did not exist, *see, e.g.*, *Cruz v. Coach Stores, Inc.*, 196 F.R.D. 228, 231 (S.D.N.Y. 2000). Indeed, the SEC has

55

made no secret of its intention to challenge the Committee's and Sutter's privilege assertions and to demand evidence substantiating those assertions. *See, e.g.*, SEC D.Ct. Reply at 19-20; [SEC]'s…Opp'n to Resp'ts' Mot. for a Stay Pending Appeal at 7 & n.7, 9, 12 (Dec. 4, 2015) (D.Ct. ECF #44).

At bottom, "reasonableness" in this case pits the burdens on the Committee and Sutter of litigating in the SDNY against the burdens on the SEC of seeking to enforce these subpoenas in the DDC. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (whether "a party unfairly is at a 'severe disadvantage' *in comparison* to his opponent" (emphasis added)). The burdens on the SEC are non-existent, given that it employs numerous D.C.-based lawyers, which D.C.-based lawyers are representing the SEC on this appeal. On the other hand, the Committee and Sutter are subject to real and substantial burdens, including imminent disruptions to the Committee's legislative business, which burdens would be minimized if this suit were to proceed in the DDC. The District Court erred in concluding otherwise.

B.    The distant-forum burdens on the Committee and Sutter also required transfer of this case to the DDC, pursuant to 28 U.S.C. § 1404(a). *See Burger King*, 471 U.S. at 483-84 ("[T]o the extent that it is inconvenient for a party who has minimum contacts with a forum to litigate there, such considerations most frequently can be accommodated through a change of venue."); *Humid-Aire Corp.*

*v. J. Levitt, Inc.*, No. 77-cv-1110, 1977 WL 1529, at *2 (N.D. Ill. Nov. 14, 1977)

("If retention of the action in a particular forum is oppressive to the defendants, the

action may be transferred….*This position carries particular weight when the*

*statute creating the right authorizes nationwide service of process*." (emphasis

added; citing *Mariash*, 496 F.2d at 1143)); Wright & Miller, § 1068.1

("[D]efendants in such cases still may look to venue and transfer provisions to

protect their interest in litigating in a more convenient forum.").

The District Court had discretion under § 1404(a) to grant the transfer

request so long as doing so promoted "the convenience of parties and witnesses"

and "the interest of justice" – a calculus that turns on a balance of factors similar to

those informing the due process "reasonableness" inquiry.  *See Metro. Life Ins. Co.*

*v. Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996).[29]  The District Court,

however, found that "[t]hose factors are either neutral or favor denial of the

transfer motion" and denied the request, JA137, a conclusion that was "a clear

---

[29]  These factors include, *inter alia*:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses,
> (3) the location of relevant documents and relative ease of access to
> sources of proof, (4) the convenience of parties, (5) the locus of
> operative facts, (6) the availability of process to compel the
> attendance of unwilling witnesses, and (7) the relative means of the
> parties.

*N.Y. Marine v. Lafarge*, 599 F.3d 102, 112 (2d Cir. 2010) (quotation marks
omitted).

error of judgment." *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 395 F.App'x 743, 744 (2d Cir. 2010).

*First*, the District Court dismissed the inconvenience to the Committee and Sutter of litigating this matter in the SDNY by presuming, again, that, "[i]n summary proceedings such as this, testimony from parties and witnesses is rarely necessary." JA132 (quotation marks omitted). As explained above, that presumption is wrong. Moreover, the SEC never has suggested that it would be inconvenient for it to litigate this matter in D.C., where it is headquartered.

*Second*, the District Court gave undue weight to "[t]he convenience to the SEC in litigating near the situs of its investigation and staff personnel." JA133 (quotation marks omitted). Although the SEC may be "carrying on" its investigation in the SDNY, it also is "carrying on" its investigation in D.C., inasmuch as (i) it "has collected documents from Washington, D.C.-based entities and interviewed witnesses who reside in [D.C.]," JA98,¶4; (ii) both subpoenas here directed compliance in D.C.; and (iii) the SEC has relied on counsel in D.C. to litigate this matter. *See, e.g.*, *FEC v. Comm. to Elect*, 613 F.2d 849, 858 n.9 (D.C. Cir. 1979) ("To say that the Commission's inquiry was being carried on in the District of Columbia is not to say that it is not also being carried on in New York.").

58

*Third*, the District Court dismissed the relative means of the parties – and Sutter in particular – based on an inapt observation that this factor is "rarely…a *dispositive* reason to grant or deny a transfer motion," as well as the still-flawed hypothesis that "Sutter will [not] be required to travel to New York for purposes of this litigation." JA135 (emphasis added; quotation marks omitted). Moreover, to the extent the SEC can rely on D.C.-based lawyers to handle this dispute, as indeed it is doing – whereas the Committee can tap no New York-based resources – transfer to D.C. necessarily will reduce "the burden…on the taxpayer, who finances the federal government and who is no less worthy of the protection of the law than [private parties]." *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 665 (7th Cir. 2003).

*Finally*, the District Court unduly deferred to the SEC's choice of forum by fixating on the underlying *SEC investigation's* nexus to the SDNY. The "core operative facts" of this *subpoena enforcement action*, however, "have little or no connection with" the SDNY. *In re Herald*, 540 F.App'x 19, 26 (2d Cir. 2013) (quotation marks omitted). The District Court overlooked that (i) the SEC served these subpoenas in D.C., not New York; (ii) these subpoenas focus exclusively on documents and alleged conduct occurring within D.C., not New York; (iii) these subpoenas demand compliance in D.C., not New York; and (iv) any "non-compliance" with these subpoenas occurred in D.C., not New York.

59

Transferring this matter to the DDC plainly would promote "the convenience of parties and witnesses" and "the interest of justice."  28 U.S.C. § 1404(a).  The District Court's contrary conclusion manifested a "clear error of judgment" that must be reversed.  *Wal-Mart*, 395 F.App'x at 744.

## CONCLUSION

This Court should reverse, and remand for dismissal (or transfer).

Respectfully submitted,

Kerry W. Kircher, General Counsel
*/s/ William Pittard*
William Pittard, Deputy General Counsel
Todd B. Tatelman, Senior Assistant Counsel
Eleni M. Roumel, Assistant Counsel
Isaac B. Rosenberg, Assistant Counsel
Kimberly Hamm, Assistant Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone:   (202) 225-9700
Facsimile:   (202) 226-1360
william.pittard@mail.house.gov

*Counsel for Respondents-Appellants the Committee on Ways and Means of the U.S. House of Representatives, and Brian Sutter*

March 4, 2016

60

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type.


*/s/ William Pittard*
William Pittard

## CERTIFICATE OF SERVICE

I certify that on March 4, 2016, I filed one copy of the foregoing Brief for Respondents-Appellants the Committee on Ways and Means of the U.S. House of Representatives, and Brian Sutter via the CM/ECF system of the United States Court of Appeals for the Second Circuit, which I understand caused service on all registered parties.

*/s/ William Pittard*
William Pittard

# ADDENDUM

**(REPRODUCTION OF PARTICULARLY RELEVANT
CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES)**

U.S. Const. art. I, § 6, cl.1:

> The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S. Const. amend. V:

>No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

<u>5 U.S.C. § 701(b)</u>:

For the purpose of this chapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix; and

(2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

<u>5 U.S.C. § 702</u>:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

15 U.S.C. § 78u(c):

> Judicial enforcement of investigative power of Commission; refusal to obey subp[o]ena; criminal sanctions
>
> In case of contumacy by, or refusal to obey a subp[o]ena issued to, any person, the Commission may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records. And such court may issue an order requiring such person to appear before the Commission or member or officer designated by the Commission, there to produce records, if so ordered, or to give testimony touching the matter under investigation or in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof. All process in any such case may be served in the judicial district whereof such person is an inhabitant or wherever he may be found. Any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry or to produce books, papers, correspondence, memoranda, and other records, if in his power so to do, in obedience to the subp[o]ena of the Commission, shall be guilty of a misdemeanor and, upon conviction, shall be subject to a fine of not more than $1,000 or to imprisonment for a term of not more than one year, or both.

<u>STOCK Act, § 4</u>:

## PROHIBITION OF INSIDER TRADING.

(a) AFFIRMATION OF NONEXEMPTION.--Members of Congress and employees of Congress are not exempt from the insider trading prohibitions arising under the securities laws, including section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

(b) DUTY.--

(1) PURPOSE.--The purpose of the amendment made by this subsection is to affirm a duty arising from a relationship of trust and confidence owed by each Member of Congress and each employee of Congress.

(2) AMENDMENT.--Section 21A of the Securities Exchange Act of 1934 (15 U.S.C. 78u-1) is amended by adding at the end the following:

"(g) DUTY OF MEMBERS AND EMPLOYEES OF CONGRESS.--

"(1) IN GENERAL.—Subject to the rule of construction under section 10 of the STOCK Act and solely for purposes of the insider trading prohibitions arising under this Act, including section 10(b) and Rule 10b-5 thereunder, each Member of Congress or employee of Congress owes a duty arising from a relationship of trust and confidence to the Congress, the United States Government, and the citizens of the United States with respect to material, nonpublic information derived from such person's position as a Member of Congress or employee of Congress or gained from the performance of such person's official responsibilities.

"(2) DEFINITIONS.--In this subsection--

"(A) the term 'Member of Congress' means a member of the Senate or House of Representatives, a Delegate to the House of Representatives, and the Resident Commissioner from Puerto Rico; and

"(B) THE TERM 'EMPLOYEE OF CONGRESS' MEANS.--

"(i) any individual (other than a Member of Congress), whose compensation is disbursed by the Secretary of the Senate or the Chief Administrative Officer of the House of Representatives; and

"(ii) any other officer or employee of the legislative branch (as defined in section 109(11) of the Ethics in Government Act of 1978 (5 U.S.C. App. 109(11))).

"(3) RULE OF CONSTRUCTION.--Nothing in this subsection shall be construed to impair or limit the construction of the existing antifraud provisions of the securities laws or the authority of the Commission under those provisions."

STOCK Act, § 10:

**RULE OF CONSTRUCTION.**

Nothing in this Act, the amendments made by this Act, or the interpretive guidance to be issued pursuant to sections 3 and 9 of this Act, shall be construed to--

> (1) impair or limit the construction of the antifraud provisions of the securities laws or the Commodity Exchange Act or the authority of the Securities and Exchange Commission or the Commodity Futures Trading Commission under those provisions;

> (2) be in derogation of the obligations, duties, and functions of a Member of Congress, an employee of Congress, an executive branch employee, a judicial officers, or a judicial employee, arising from such person's official position; or

> (3) be in derogation of existing laws, regulations, or ethical obligations governing Members of Congress, employees of Congress, executive branch employees, judicial officers, or judicial employees.

House Rule VIII:

RESPONSE TO SUBPOENAS

1. When a Member, Delegate, Residence Commissioner, officer, or employee of the House is properly served with a judicial or administrative subpoena or judicial order directing appearance as a witness relating to the official functions of the House or for the production or disclosure of any document relating to the official functions of the House, such Member, Delegate, Resident Commissioner officer, or employee shall comply, consistently with the privileges and rights of the House, with the judicial or administrative subpoena or judicial order as hereinafter provided, unless otherwise determined under this rule.

2. Upon receipt of a properly served judicial or administrative subpoena or judicial order described in clause 1, a Member, Delegate, Resident Commissioner, officer, or employee of the House shall promptly notify the Speaker of its receipt in writing. Such notification shall promptly be laid before the House by the Speaker. During a period of recess or adjournment of longer than three days, notification to the House is not required until the reconvening of the House, when the notification shall promptly be laid before the House by the Speaker.

3. Once notification has been laid before the House, the Member, Delegate, Resident Commissioner, officer, or employee of the House shall determine whether the issuance of the judicial or administrative subpoena or judicial order described in clause 1 is a proper exercise of jurisdiction by the court, is material and relevant, and is consistent with the privileges and rights of the House. Such Member, Delegate, Resident Commissioner, officer, or employee shall notify the Speaker before seeking judicial determination of these matters.

4. Upon determination whether a judicial or administrative subpoena or judicial order described in clause 1 is a proper exercise of jurisdiction by the court, is material and relevant, and is consistent with the privileges and rights of the House, the Member, Delegate, Resident Commissioner, officer, or employee of the House shall immediately notify the Speaker of the determination in writing.

5. The Speaker shall inform the House of a determination whether a judicial or administrative subpoena or judicial order described in clause 1 is a proper exercise of jurisdiction by the court, is material and relevant, and is consistent with the privileges and rights of the House. In so informing the House, the Speaker shall generally describe the records or information sought. During a period of recess or adjournment of longer than three days, such notification is not required until the reconvening of the House, when the notification shall promptly be laid before the House by the Speaker.

6.(a) Except as specified in paragraph (b) or otherwise ordered by the House, upon notification to the House that a judicial or administrative subpoena or judicial order described in clause 1 is a proper exercise of jurisdiction by the court, is material and relevant, and is consistent with the privileges and rights of the House, the Member, Delegate, Resident Commissioner, officer, or employee of the House shall comply with the judicial or administrative subpoena or judicial order by supplying certified copies.

(b) Under no circumstances may minutes or transcripts of executive sessions, or evidence of witnesses in respect thereto, be disclosed or copied. During a period of recess or adjournment of longer than three days, the Speaker may authorize compliance or take such other action as the Speaker considers appropriate under the

Add.10

circumstances. Upon the reconvening of the House, all matters than transpired under this clause shall promptly be laid before the House by the Speaker.

7. A copy of this rule shall be transmitted by the Clerk to the court when a judicial or administrative subpoena or judicial order described in clause is issued and served on a Member, Delegate, Resident Commissioner, officer, or employee of the House.

8. Nothing in this rule shall be construed to deprive, condition, or waive the constitutional or legal privileges or rights applicable or available at any time to a Member, Delegate, Resident Commissioner, officer, or employee of the House, or of the House itself, or the right of such Member, Delegate, Resident Commissioner, officer, or employee, or of the House itself, to assert such privileges or rights before a court in the United States.

House Rule X.1(t):

ORGANIZATION OF COMMITTEES

**Committees and their legislative jurisdictions**

1. There shall be in the House the following standing committees, each of which shall have the jurisdiction and related functions assigned by this clause and clauses 2, 3, and 4. All bills, resolutions, and other matters relating to subjects within the jurisdiction of the standing committees listed in this clause shall be referred to those committees, in accordance with clause 2 of rule XII, as follows:

. . . .

(t) **Committee on Ways and Means.**

(1) Customs revenue, collection districts, and ports of entry and delivery.

(2) Reciprocal trade agreements.

(3) Revenue measures generally.

(4) Revenue measures relating to insular possessions.

(5) Bonded debt of the United States, subject to the last sentence of clause 4(f).

(6) Deposit of public monies.

(7) Transportation of dutiable goods.

(8) Tax exempt foundations and charitable trusts.

(9) National social security (except health care and facilities programs that are supported from general revenues as opposed to payroll deductions and except work inventive programs).

House Rule X.2(a), (b):

**General oversight responsibilities.**

2.(a). The various standing committees shall have general oversight responsibilities as provided in paragraph (b) in order to assist the House in—

(1) its analysis, appraisal, and evaluation of–

(A) the application, administration, execution, and effectiveness of Federal laws; and

(B) conditions and circumstances that may indicate the necessity or desirability of enacting new or additional legislation; and

(2) its formulation, consideration, and enactment of changes in Federal laws, and of such additional legislation as may be necessary or appropriate.

(b)(1) In order to determine whether laws and programs addressing subjects within the jurisdiction of a committee are being implemented and carried out in accordance with the intent of Congress and whether they should be continued, curtailed, or eliminated, each standing committee (other than the Committee on Appropriations) shall review and study on a continuing basis –

(A) the application, administration, execution, and effectiveness of laws and programs addressing subjects within its jurisdiction;

(B) the organization and operation of Federal agencies and entities having responsibilities for the administration and execution of laws and programs addressing subjects within its jurisdiction;

Add.14

(C) any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation addressing subjects within its jurisdiction (whether or not a bill or resolution has been introduced with respect thereto); and

(D) future research and forecasting on subjects within its jurisdiction.

(2) Each committee to which subparagraph (1) applies having more than 20 members shall establish an oversight subcommittee, or require its subcommittee to conduct oversight in their respective jurisdiction, to assist in carrying out its responsibilities under this clause. The establishment of an oversight subcommittee does not limit the responsibility of a subcommittee with legislative jurisdiction in carrying out its oversight responsibilities.

House Rule XI.1(b)(1):

> Each committee may conduct at any time such investigation and studies as it considers necessary or appropriate in the exercise of its responsibilities under rule X. Subject to the adoption of expense resolutions as required by clause 6 of rule X, each committee may incur expenses, including travel expenses, in connection with such investigations and studies.

Committee Rule 8.3:

**The Subcommittee on Health** shall consist of 18 Members, 11 of whom shall be Republicans and 7 of whom shall be Democrats.

The jurisdiction of the Subcommittee on Health shall include bills and matters referred to the Committee on Ways and Means that relate to programs providing payments (from any source) for health care, health delivery systems, or health research. More specifically, the jurisdiction of the Subcommittee on Health shall include bills and matters that relate to the health care programs of the Social Security Act (including titles V, XI (Part B), XVIII, and XIX thereof) and, concurrent with the full Committee, tax credit and deduction provisions of the Internal Revenue Code dealing with health insurance premiums and health care costs.